Billy JOHNSON, Plaintiff and Appellant,

v.

MORTON THIOKOL, INC., Defendant
and Appellee.

No. 890315.

Supreme Court of Utah.

Sept. 5, 1991.

Philip C. Patterson, Ogden, for Johnson.

Mary Anne Q. Wood, Salt Lake City, for Morton Thiokol Co.

HALL, Chief Justice:

Plaintiff Billy Johnson sought to recover damages resulting from the involuntary termination of his employment. From an entry of summary judgment in favor of defendant Morton Thiokol, Inc. ("Thiokol"), Johnson appeals. When reviewing an order granting summary judgment, the facts and all reasonable inferences that can be drawn from the facts are viewed in a light most favorable to the party opposing the motion.[1]

Johnson was hired by Thiokol on February 12, 1979, as a process inspector and was continuously employed at Thiokol until the date of his termination, July 20, 1988. At no time during his employment did he enter into an express contract with Thiokol which restricted Thiokol's ability to terminate his employment. Throughout Johnson's tenure, Thiokol published and distributed an employee handbook. The text of the handbook contains several pages prescribing Thiokol's policy concerning employee disciplinary, appraisal, and grievance procedures.[2] In administering John-

---

1. *Culp Constr. Co. v. Buildmart Mall,* 795 P.2d 650, 651 (Utah 1990).

2. The handbook provides in part:

**GENERAL POLICY**

It is the policy of Morton Thiokol, Inc., to establish reasonable rules of employment conduct and to ensure compliance with these rules through a program consistent with the best interests of the Company and its employees.

Violation of rules of conduct may result in one of the following forms of corrective discipline:
• Employee Discussion
• Notice of Caution
• Involuntary suspension without pay, not to exceed five days
• Termination

To assure uniform treatment of all employees, Employee Relations must approve all cases of notice of caution, suspension, or termination prior to implementation. Individual supervisors are responsible for recom-

mending disciplinary action, but ultimate authority with the respect to discipline rests with the appropriate vice president for any given case.

**CATEGORIES OF RULE INFRACTIONS**
• Category 1—Infractions that may result in an Employee Discussion or Notice of Caution. Termination or suspension can occur under Category 1, if the severity of the violation warrants such action.
• Category 2—Infractions that will result in a Notice of Caution and could result in disciplinary suspension or termination.

Some rules of conduct may apply to either category. A supervisor's determination of the category for which discipline is recommended will include consideration of the seriousness of the violation, the employee's past record, and extenuating circumstances. Suspension without pay, for up to five working days, may be applied if warranted in connection with Notices of Caution.

Two Notices of Caution for the same offense, or a total of four Notices of Caution for

son's nine employee appraisals, Thiokol complied with the procedures set out in the handbook. However, the introduction of the handbook contains clear and conspicuous language stating that the provisions of the manual are not intended to operate as terms of an employment contract.

In the beginning of July 1988, Thiokol implemented a leak check test procedure for verifying the proper placement and seal of Thiokol's redesigned O-rings, which are used in space shuttle rocket motors. Johnson, although he had not received adequate training regarding the new process, was assigned to inspect the leak check test procedure. For the three weeks prior to the date of the incident which resulted in his termination, Johnson and all members of the inspection crews worked mandatory overtime in order to meet Air Force-imposed deadlines. In connection with these deadlines, the inspectors were urged by upper management to avoid shut-down orders because such orders would result in unacceptable scheduling pressure.

When Johnson arrived at work on July 8, 1988, the technicians were involved in setting up five simultaneous operations. It had become common practice to perform numerous operations simultaneously even though there was only one inspector assigned to the building. An inspector was required to witness each operation, but due to the simultaneous "setups," it was impossible for one inspector to observe each procedure. Johnson therefore prioritized those areas where actual observations were made. At one point, he was notified that a setup had been completed. He glanced at the setup but did not complete the thirty-nine-step breakdown required to verify the procedure. However, he verified that he had completed the appropriate inspection. Due to the inadequate inspection, Johnson

failed to notice that certain hoses had been improperly installed.

The next day, during a routine test operation, excess pressure caused by the improperly installed hoses forced the O-rings out of their groove and damaged some insulation lining on the motor. The damage required that the test motor be disassembled to make repairs, causing a twenty-day delay in the test firing of the rocket motor. The incident resulted in an investigation by NASA officials and was highly publicized in both the local and national news media. Johnson and the employee who installed the hoses were terminated.

Johnson was terminated pursuant to the procedures set out in the employee handbook. After his termination, he initiated grievance procedures which were also conducted in accordance with the handbook. The grievance was denied on the ground that Johnson was terminated for "careless or inefficient performance of duty," a ground which, according to the handbook, can result in termination.

On February 22, 1989, Johnson commenced this action, claiming that Thiokol, by terminating his employment without good cause, breached an implied-in-fact contract provision. Thiokol filed a motion to dismiss pursuant to Utah Rule of Civil Procedure 12(b)(6). At the hearing, the motion was treated as a motion for summary judgment under Utah Rule of Civil Procedure 56. The trial court dismissed Johnson's case on the grounds that no implied-in-fact contract existed between Johnson and Thiokol and, alternatively, that Johnson was fired for good cause. Johnson appeals from these rulings.

■ Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judg-

---

any combination of offenses, within a two-year period, may result in involuntary termination.

Notices of Caution become void after two years, and Human Resources is responsible for purging the official personnel files.

. . . .

**PROMOTIONS AND PAY INCREASES**

Like most people, you are probably looking forward to increased responsibility and promotion, and Morton Thiokol recognizes this as a natural and worthy desire.

Performance evaluations provide a guide for improvement of your work and a basis for your promotions and merit increases in pay.

ment as a matter of law.[3] Therefore, when reviewing an order granting summary judgment, the evidence and all inferences that may be reasonably drawn from the evidence must be liberally construed in favor of the party opposing the motion.[4] The determination of whether, given this view of the evidence, the moving party is entitled to a judgment is a question of law, which is reviewed for correctness.[5] The first issue presented on appeal, therefore, is whether the trial court erred in ruling that there was no implied contract provision limiting Thiokol's ability to terminate Johnson. If the trial court was correct in this ruling, it will not be necessary to reach the second issue, whether Johnson was fired for cause.

Johnson argues that although he did not have an express contract with Thiokol and was hired for an indefinite term, he is entitled to damages resulting from the termination of his employment under our recent case of *Berube v. Fashion Centre, Ltd.*[6] *Berube* modified Utah's position on the doctrine of employment at will. In Utah, an employee hired for an indefinite period is presumed to be an employee at will who can be terminated for any reason whatsoever so long as the termination does not violate a state or federal statute.[7] Prior to *Berube,* in order for indefinite-term employees to establish that their employment was not at will, it was necessary to show an express or implied stipulation as to the duration of the employment or consideration beyond the rendering of services under the employment contract.[8] *Berube* modified this position by holding that the terms of an employee manual can operate as implied-in-fact contract terms rebutting the presumption of at-will employment and fixing the terms of the employee relationship.[9] In addition,

---

3. Utah R.Civ.P. 56(c); *see, e.g., Clover v. Snowbird,* 808 P.2d 1037, 1039 (Utah 1991); *Utah State Coalition of Senior Citizens v. Utah Power & Light Co.,* 776 P.2d 632, 634 (Utah 1989).

4. *See, e.g., Copper State Leasing Co. v. Blacker Appliance & Furniture Co.,* 770 P.2d 88, 89 (Utah 1988); *Payne v. Myers,* 743 P.2d 186, 187–88 (Utah 1987).

5. *See, e.g., Blue Cross & Blue Shield v. State of Utah,* 779 P.2d 634, 636 (Utah 1989); *Bonham v. Morgan,* 788 P.2d 497, 499 (Utah 1989).

6. 771 P.2d 1033 (Utah 1989).

7. *Rose v. Allied Dev. Co.,* 719 P.2d 83, 84–85 (Utah 1986). There are state and federal statutes that limit an employer's ability to terminate employees on the basis of race, color, religion, sex, national origin, age, and handicap. *See, e.g.,* Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1); Utah Code Ann. § 34-35-6.
   There is dictum in *Berube* and in *Hodges v. Gibson Products Co.,* 811 P.2d 151 (Utah 1991), suggesting that Justices Durham, Stewart, and Zimmerman would recognize a public policy exception to the at-will doctrine. *See Berube,* 771 P.2d at 1042–43 (Durham, J., joined by Stewart, J.), at 1051 (Zimmerman, J., concurring in the result); *Hodges,* 811 P.2d at 165–68 (Stewart, J., joined by Durham, J.), at 168 (Zimmerman, J., concurring in the result, joined by Hall, C.J.). Such an exception would prevent employers from terminating employees for reasons that violate public policy. However, these justices do not agree on the nature of such an exception. *See Berube,* 771 P.2d at 1042–43 (Durham, J., joined by Stewart, J.), at 1051 (Zimmerman, J., concurring in the result);

*Hodges,* 811 P.2d at 165–68 (Stewart, J., joined by Durham, J.), at 168 (Zimmerman, J., concurring in the result, joined by Hall, C.J.). In any event, the public policy exception has yet to be clearly established in Utah.

8. *Rose,* 719 P.2d at 85; *Bihlmaier v. Carson,* 603 P.2d 790, 792 (Utah 1979).

9. *Berube* is a plurality opinion. However, the opinions of Justices Durham and Zimmerman establish that an employee manual can rebut the presumption of at-will employment by showing the existence of an implied-in-fact contract term providing that the employment is not at will. *Berube,* 771 P.2d at 1044–46, 1048 (Durham, J., joined by Stewart, J.), at 1052–53 (Zimmerman, J., concurring in the result); *see also Brehany v. Nordstrom, Inc.,* 812 P.2d 49, 54 (Utah 1991) (discussing *Berube's* holding).
   The lead opinion in *Berube,* written by Justice Durham and joined by Justice Stewart, discussed three exceptions to the at-will employment doctrine, the public policy exception, the implied contract exception, and an exception based on the implied covenant of good faith and fair dealing. *See Berube,* 771 P.2d at 1042–47. The decision, however, was based on the theory that the presumption of at-will employment may be rebutted by implied contract terms. *See Berube,* 771 P.2d at 1049–50. All five justices agreed that an implied contract provision may rebut the presumption of employment at will, *Berube,* 771 P.2d at 1044–46 (Durham, J., joined by Stewart, J.), at 1050 (Howe, Assoc. C.J., concurring, joined by Hall, C.J.), at 1052–53 (Zimmerman, J., concurring in the result), although there was not complete agreement on the nature of such a claim. *See Berube,* 771 P.2d at 1052–53 (Zimmerman, J., concurring in the result).

*Berube* established that the continued performance of the employee's duties is adequate consideration for such an implied contract provision.[10]

■ There are issues concerning the implied-in-fact employee contracts recognized in *Berube* that have yet to be addressed. However, *Berube* and its progeny have established several principles regarding these relationships. It is clear that the employee has the burden of establishing the existence of an implied-in-fact contract provision,[11] that is, the employee must show that although there was no express contract provision to this effect, the parties nevertheless agreed that the employment would not be at will.[12] If the parties actually intended such an agreement and the agreement is of such a nature that it is possible to operate as a contract term, a court will give effect to the parties' intentions by enforcing the agreement as an implied-in-fact contract provision.[13] The

existence of such an agreement is a question of fact which turns on the objective manifestations of the parties' intent.[14] As a question of fact, the intent of the parties is primarily a jury question.[15] However, if the evidence presented is such that no reasonable jury could conclude that the parties agreed to limit the employer's right to terminate the employee, it is appropriate for a court to decide the issue as a matter of law.[16]

■ We have also addressed the nature of indefinite-term employment relationships with implied-in-fact contract provisions which limit an employer's right to terminate an employee. In *Brehany v. Nordstrom, Inc.*, we stated that if an employee manual is to be considered part of an employment contract, the terms should be considered terms of a unilateral contract.[17] Several jurisdictions have taken such an approach.[18] Under a unilateral contract

---

Johnson's appeal is limited to an implied-in-fact contract claim.

**10.** *Berube,* 771 P.2d at 1044–46, 1048 (Durham, J., joined by Stewart, J.), at 1052–53 (Zimmerman, J., concurring in the result); *see also Brehany,* 812 P.2d at 54.

**11.** *Berube,* 771 P.2d at 1044 (Durham, J., joined by Stewart, J.), at 1052 (Zimmerman, J., concurring in the result).

**12.** *Berube,* 771 P.2d at 1044 (Durham, J., joined by Stewart, J.), at 1052 (Zimmerman, J., concurring in the result); *see Quality Performance Lines v. Yoho Automotive,* 609 P.2d 1340, 1341 (Utah 1980).

**13.** *Berube,* 771 P.2d at 1044 (Durham, J., joined by Stewart, J.), at 1052 (Zimmerman, J., concurring in the result); *see Quality Performance Lines,* 609 P.2d at 1341–42.

**14.** *Berube,* 771 P.2d at 1044 (Durham, J., joined by Stewart, J.), at 1052 (Zimmerman, J., concurring in the result); *Quality Performance Lines,* 609 P.2d at 1341; *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 626 (Minn.1983).

**15.** *Brehany,* 812 P.2d at 57; *Caldwell v. Ford, Bacon & Davis Utah, Inc.,* 777 P.2d 483, 487 (Utah 1989); *Berube,* 771 P.2d at 1044 (Durham, J., joined by Stewart, J.), at 1052 (Zimmerman, J., concurring in the result).
While the existence of an agreement which forms the basis of an implied-in-fact contract provision is a question of fact, not all issues relating to implied employment contract provi-

sions are factual questions. Indeed, we have held that when terms of an employee manual constitute an employment contract, the proper interpretation of the unambiguous terms of the manual is an issue for the court. *Caldwell,* 777 P.2d at 485–86. If it is determined that an agreement exists between an employee and an employer, the same legal question (i.e., interpretation of unambiguous terms) and the same factual questions (i.e., interpretation of ambiguous terms) may arise under the implied contract as may arise under any agreement that is alleged to form an express contract. Therefore, in some situations it is appropriate to uphold a grant of summary judgment on a legal question that arises under the alleged contract. *Id.*

**16.** *See Clover v. Snowbird,* 808 P.2d at 1040; *Birkner v. Salt Lake County,* 771 P.2d 1053, 1057 (Utah 1989) (both cases hold that court may decide factual questions where reasonable minds cannot differ). *See generally Loose v. Nature–All Corp.,* 785 P.2d 1096, 1098 (Utah 1989) (court reviewed trial court finding of fact concerning existence of implied-in-fact agreement for substantial evidence).

**17.** *Brehany,* 812 P.2d at 56 n. 2. *Brehany* involved an implied contract provision limiting an employer's right to terminate an indefinite-term employee. A unilateral contract analysis may not be applicable where it is alleged that an implied-in-fact contract exists, creating employment for a definite period.

**18.** *E.g., Brooks v. Trans World Airlines, Inc.,* 574 F.Supp. 805, 809 (D.Colo.1983); *Hoffman–La Roche, Inc. v. Campbell,* 512 So.2d 725, 731

analysis, an employer's promise of employment under certain terms and for an indefinite period constitutes both the terms of the employment contract and the employer's consideration for the employment contract. The employee's performance of service pursuant to the employer's offer constitutes both the employee's acceptance of the offer and the employee's consideration for the contract.[19] Therefore, for an implied-in-fact contract term to exist, it must meet the requirements for an offer of a unilateral contract. There must be a manifestation of the employer's intent that is communicated to the employee [20] and sufficiently definite to operate as a contract provision.[21] Furthermore, the manifestation of the employer's intent must be of such a nature that the employee can reasonably believe that the employer is making an offer of employment other than employment at will.[22] The unilateral nature of such an employment contract is important because it affects the flexibility of the employment relationship.

> In the case of unilateral contract for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. In this manner, an original employment contract may be modified or replaced by a subsequent unilateral contract. The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employment

supplies the necessary consideration for the offer.[23]

Indeed, such an approach is consistent with our case law decided prior to *Brehany* where we have held that the terms of an employee manual may constitute terms of an employment contract even when the employees do not receive the manual until after they are hired.[24]

■ However, it is not clear what type of evidence is sufficient to raise a triable issue concerning the intentions of the parties and therefore the existence of an implied-in-fact contract term. In cases where we have held that there is a triable issue regarding the existence of such a term, we have based our decision upon express statements of the employer. Specifically, we have held that employee manuals and bulletins containing policies for employee termination are legitimate sources for determining the apparent intentions of the parties and for fixing the terms of the employment relationship.[25] However, we have not seen fit to limit the evidence concerning the parties' intent to such situations. Though the exact parameters concerning the nature of the evidence a jury may properly consider to arrive at the parties' intent and to fix the terms of the employee relationship are yet to be determined, it is clear that the evidence must be sufficient to fulfill the requirements of a unilateral offer.

■ Applying these principles to the instant case, it is clear that the trial judge was correct in ruling as a matter of law that no implied contract provision existed limiting Thiokol's right to terminate John-

(Ala.1987); *Pine River State Bank,* 333 N.W.2d at 626–27.

**19.** *See* 1 Corbin, *Corbin on Contracts* § 21 (1963); *see also supra* note 17.

**20.** *See supra* note 17.

**21.** *See* Restatement (Second) of Contracts § 33 (1979) (must be certain enough to determine existence of breach and appropriate remedy); *see also Pine River State Bank,* 333 N.W.2d at 626.

**22.** *See supra* note 17; *see also, e.g., Doe v. First Nat'l Bank of Chicago,* 865 F.2d 864, 873 (7th Cir.1989) (applying Illinois law); *Leikvold v.*

*Valley View Community Hosp.,* 141 Ariz. 544, 688 P.2d 170, 174 (1984); *Hoffman–La Roche, Inc.,* 512 So.2d at 734; *Nork v. Fetter Printing Co.,* 738 S.W.2d 824, 827 (Ky.Ct.App.1987); *Bailey v. Perkins Restaurants, Inc.,* 398 N.W.2d 120, 121–23 (N.D.1986).

**23.** *Pine River State Bank,* 333 N.W.2d at 627.

**24.** *Caldwell,* 777 P.2d at 485.

**25.** *Brehany,* 812 P.2d at 57; *Caldwell,* 777 P.2d at 485–86; *Berube,* 771 P.2d at 1044–46, 1048 (Durham, J., joined by Stewart, J.), at 1052–53 (Zimmerman, J., concurring in the result).

son. Johnson's allegations are insufficient to create a triable issue concerning whether Johnson could reasonably believe that Thiokol intended to modify the employment relationship to provide that an employee could be terminated only for good cause. This can be seen by examining the specific allegations upon which Johnson bases his claim. Johnson argues that an implied-in-fact contract term providing that he should be terminated only for good cause is evidenced by the procedures set out in the handbook for appraisals, discipline, and grievances; the administration of its annual employee performance evaluation program; Johnson's and Thiokol's joint use of the grievance procedures; and Thiokol's stated good cause reason for terminating Johnson.

It is to be observed that Johnson's reliance on the terms of the employee handbook is misplaced. We have held that the terms of employee manuals may raise triable issues concerning the existence of an implied-in-fact contract.[26] However, the manual presently at issue contains clear and conspicuous language disclaiming any contractual liability and stating Thiokol's intent to maintain an at-will relationship with its employees:

> This book is provided for general guidance only. The policies and procedures expressed in this book, as well as those in any other personnel materials which may be issued from time to time, do not create a binding contract or any other obligation or liability on the company. Your employment is for no set period and may be terminated without notice and at will at any time by you or the company. The company reserves the right to change these policies and procedures at any time for any reason.

Given this language, the only reasonable conclusion an employee or a juror could reach concerning Thiokol's intention is that Thiokol intended to retain the right to discharge for any reason. Treating the handbook as part of the employment contract, traditional rules of contract interpretation would require us to read the handbook as a whole, harmonizing all of the provisions.[27] Therefore, the procedures in the handbook for terminating an employee must be read in light of the language in the disclaimer which clearly reserved the right to discharge for any reason. Under such an approach, the most Johnson is entitled to is the right to challenge his termination under the handbook's procedures, not the right to be fired only for good cause. We also note that a number of jurisdictions have held that a clear and conspicuous disclaimer, as a matter of law, prevents employee manuals or other like material from being considered as implied-in-fact contract terms.[28]

Therefore, at the time the handbook was first distributed to Johnson, his employ-

---

**26.** *Brehany,* 812 P.2d at 56–57; *Caldwell,* 777 P.2d at 485–86; *Berube,* 771 P.2d at 1044–46, 1048 (Durham, J., joined by Stewart, J.), at 1052–53 (Zimmerman, J., concurring in the result).

**27.** *LDS Hosp. v. Capitol Life Ins.,* 765 P.2d 857, 858 (Utah 1988); *see also* Restatement (Second) of Contracts § 202(2) (1979) (a writing should be interpreted as a whole).

**28.** The following cases have held as a matter of law that a clear and conspicuous disclaimer prevents the terms of an employee manual from being considered terms of an employment contract. *E.g., Doe v. First Nat'l Bank of Chicago,* 865 F.2d at 873 (applying Illinois law); *Dell v. Montgomery Ward & Co.,* 811 F.2d 970, 972–73 (6th Cir.1987) (applying Michigan law); *Fletcher v. Wesley Medical Center,* 585 F.Supp. 1260, 1264 (D.Kan.1984); *Hoffman–La Roche, Inc.,* 512 So.2d at 734; *Bennett v. Evanston Hosp.,* 184 Ill.App.3d 1030, 133 Ill.Dec. 113, 114–15, 540 N.E.2d 979, 980–81 (1989); *Nork,* 738 S.W.2d at 827; *Castiglione v. Johns Hopkins Hosp.,* 69 Md. App. 325, 517 A.2d 786, 793–94 (1986), *cert. denied,* 309 Md. 325, 523 A.2d 1013 (1987); *Pine River State Bank,* 333 N.W.2d at 627; *Bailey,* 398 N.W.2d at 121–23; *Small v. Springs Indus., Inc.,* 292 S.C. 481, 357 S.E.2d 452, 455 (1987), *on appeal after remand,* 300 S.C. 481, 388 S.E.2d 808 (1990); *Messerly v. Asamera Minerals, (U.S.) Inc.,* 55 Wash.App. 811, 780 P.2d 1327, 1330 (1989); *cf. Ferraro v. Koelsch,* 124 Wis.2d 154, 368 N.W.2d 666, 671 (1985) (hidden disclaimer not effective).

Dicta in other jurisdictions also support such an approach. *See, e.g., Leikvold,* 688 P.2d at 174; *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 765 P.2d 373, 387, 254 Cal.Rptr. 211, 225 (Cal.1988); *Toussaint v. Blue Cross & Blue Shield of Mich.,* 408 Mich. 579, 292 N.W.2d 880, 895 (1980); *Hinson v. Cameron,* 742 P.2d 549, 560 (Okla.1987).

ment was at will. While it is true that subsequent expressed or implied agreements could have modified the at-will employment relationship,[29] in the instant case the remaining allegations are insufficient to raise a triable issue concerning a subsequent modification. Aside from the handbook itself, Johnson relies only on the fact that Thiokol complied with the procedures in the handbook during his annual employee appraisals and his termination. However, by complying with the handbook Thiokol did nothing that was inconsistent with the at-will employment relationship established when the handbook was first distributed to Johnson. It cannot be reasonably concluded, therefore, that Thiokol's actions communicated an intention to alter an employment relationship that existed at the time the handbook was distributed. The trial court was correct in granting summary judgment on the ground that no implied-in-fact contract provision existed between Thiokol and Johnson.

Affirmed.

HOWE, A.C.J., and ZIMMERMAN, J., concur.

STEWART, Justice (concurring in the result):

I agree with the majority that plaintiff has failed to raise a factual issue as to whether his discharge amounted to wrongful termination because it was without just cause. I write only because the majority opinion, in my view, could be somewhat misleading with respect to the law governing wrongful termination.

An indefinite-term employment contract creating a presumption of an at-will rela-

tionship may be modified by the implied-in-fact contract provisions which limit an employer's right to terminate an employee. *Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1044 (Utah 1989). The issue in this case is whether plaintiff raised a factual dispute as to whether Thiokol's express statement in its employee manual that employment was on an at-will basis was modified by the disciplinary procedures outlined in the manual and by Thiokol's course of dealings with its employees so that Thiokol could discharge for just cause only.[1]

Generally, it is a question of fact as to whether the parties acted in a manner to create implied contractual terms. *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55–57 (Utah 1991); *Lowe v. Sorenson Research Co.*, 779 P.2d 668, 670 (Utah 1989). Contract terms implied from the conduct of the parties ordinarily stand on an equal footing with express contract terms. Restatement (Second) of Contracts §§ 4, 19 (1981).[2] Implied contract terms may arise from statements in an employee manual or from an employer's course of conduct. Implied terms may provide that an employee will be discharged only for just cause, for particular misconduct, or after certain procedures have been followed by the employer. The actual conduct of the parties may modify an express statement in an employment manual that employment is only on an at-will basis, just as any contract term may be modified by the conduct of the parties.

The expanding sources of implied contract terms have been reviewed in Goetz & Scott, *The Limits of Expanded Choice: An Analysis of the Interactions Between Express and Implied Contract Terms*, 73 Calif.L.Rev. 261 (1985). The authors ob-

---

**29.** Although an implied provision cannot contradict an express contract term, *Brehany*, 812 P.2d at 55, an express contract can be modified by a subsequent implied contract. 17A Am. Jur.2d *Contracts* § 526 (1991); *see also Brooks v. Trans World Airlines, Inc.*, 574 F.Supp. at 810.

**1.** The manual's disciplinary procedures *could* have the effect of modifying the express disclaimer in the sense that both must be read together and harmonized in construing the effect of the manual. This is a question of contract construction rather than a subsequent modification as that term is generally used.

**2.** Comment (a) to section 4 of the Restatement explains, "Just as assent may be manifested by words or other conduct, sometimes including silence, so intention to make a promise may be manifested in language or by implication from other circumstances." Comment (a) to section 19 adds, "[T]here is no distinction in the effect of the promise whether it is expressed in writing, or orally, or in acts, or partly in one of these ways and partly in others."

serve that the traditional common law approach to interpretation of contracts focused first and foremost on the written agreement. Thus, "if the document appeared clear and unambiguous in its terms, its meaning was to be determined from the four corners of the instrument, without resort to extrinsic evidence." *Id.* at 273. Now, however, the law increasingly recognizes that informal understandings and usages may be implied into contracts. This approach is typified by the Uniform Commercial Code:

> The [Uniform Commercial] Code, now joined by the Second Restatement of Contracts, effectively reverses the common law presumption that the parties' writing and the official law of contract are the definitive elements of the agreement. Evidence derived from experience and practice can now trigger the incorporation of additional, implied terms.

*Id.* at 274.

In *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the United States Supreme Court recognized that an employer's de facto policies may give rise to a contractually enforceable employee right to be discharged for just cause only, even in the presence of an employee policy manual statement to the contrary. *Id.* at 600, 603, 92 S.Ct. at 2699, 2700. There are also federal and state court decisions which hold that course of conduct may negate the effect of written disclaimers designed to insulate employers from contractual liability. *See, e.g., Greene v. Howard Univ.*, 412 F.2d 1128, 1134–35 (D.C.Cir.1969) (disclaimer asserting no contractual duty on the part of employer does not necessarily relieve employer of all obligations with respect to the observance of its regulations); *Kari v. General Motors Corp.*, 402 Mich. 926, 282 N.W.2d 925 (1978) (reversed lower court's grant of summary judgment, remanded to consider employee claims regarding interpretation of employee handbook and reliance there-

on, notwithstanding disclaimer purporting to limit any employer contractual obligations); *Schipani v. Ford Motor Co.*, 102 Mich.App. 606, 612–14, 302 N.W.2d 307, 310–11 (1981) (rejected for other reasons in *Kostello v. Rockwell Int'l Corp.*, 189 Mich. App. 241, 472 N.W.2d 71 (1991)) (under appropriate circumstances, oral promises may negate the effect of disclaimers which are intended to absolve employers from liability for policies presented in employee handbook).[3]

This Court has held that "an employer's internally adopted policies and procedures concerning discharge can be sufficient evidence to rebut the presumption of at-will employment and can, in effect, become part of the contractual relationship between the employer and the employee" and that "[b]reach of the terms of this contractual relationship can result in damages determined as in any other breach of contract action." *Caldwell v. Ford, Bacon & Davis Utah, Inc.*, 777 P.2d 483, 485 (Utah 1989) (citing *Berube*, 771 P.2d at 1044–46, 1050 (Durham, J., joined by Stewart, J.), at 1052–53 (Zimmerman, J., concurring in the result)). That principle may also have the effect of overcoming express assertions that a contract is at-will.

In the present case, Johnson relies on an implied-in-fact contract theory. He argues that the procedural termination policies set forth in Thiokol's employee handbook created an implied-in-fact agreement that his employment would be terminated only for just cause. Thiokol asserts that the employment relationship was strictly at-will and, therefore, that Johnson could be terminated with or without cause. The majority places great emphasis on the disclaimer in the employee handbook which purports to preserve the at-will employment relationship, notwithstanding any contrary practices by Thiokol and notwithstanding the handbook's procedural termination policies. This disclaimer is held to be a controlling manifestation of Thiokol's intent as to the

---

3. Indeed, some authorities assert that a disclaimer in an employee handbook preserving the right to at-will discharge should be recognized only when the disclaimer is consistent with the employer's de facto employment poli-

cies. *See, e.g.,* Note, *Challenging the Employment–At–Will Doctrine Through Modern Contract Theory,* 16 U.Mich.J.L.Ref. 449, 461–63 (1983).

nature of the employment relationship. I think too much weight is given that disclaimer.

If the issue were whether there is a material issue of fact as to whether the declared at-will relationship had been modified *in any way at all* by implied terms arising from Thiokol's conduct and the other terms in the manual, there would be a material issue of fact, because Thiokol has indicated in its manual and in practice that it terminates employees only after certain procedures are followed. The employee handbook contains a detailed program setting forth specific rules of conduct, procedures for disciplinary actions, including discharge, and procedures for employee grievances. The handbook also sets forth types of conduct for which disciplinary action would or could be imposed and the possible consequences. Thiokol in fact followed those procedures in the past with respect to plaintiff and in the instant case by complying with the extensive grievance procedures set forth in the manual. Thus, there is clear evidence of an implied-in-fact contract term with respect to procedures to be followed when an employee is disciplined or discharged. The statement of these procedures in Thiokol's manual and their implementation clearly could remove the employment relationship from a strict at-will relationship. To that extent, a jury certainly could find that the at-will relationship had been modified, notwithstanding the manual's statement that employment was on an at-will basis.

Nevertheless, that is not what is critical in this case. Johnson does not argue that Thiokol failed to comply with its own procedures for termination. His complaint is that he could be discharged only with just cause and that Thiokol had no just cause. Johnson has not produced any evidence, however, that Thiokol's termination procedures, its practice of employee performance evaluations, or any of its other employee policies, provide a basis for concluding that Thiokol can terminate only for just cause.

In the abstract, it may be arguable that the logical implication of the termination procedures adopted by Thiokol could be construed to require just cause or good faith. However that may be, the evidence in this case indicates that the procedures Thiokol has adopted are intended to eliminate arbitrary conduct by Thiokol supervisors and to promote a degree of uniformity in its firing practices. That does not, on the facts of this case, impose an implied contract term on Thiokol limiting it to discharge for just cause only. If, however, there were evidence that the disciplinary procedures were in fact utilized to ensure that an employee was discharged only for just cause, then a jury could find that Thiokol's declaration that employment was on an at-will basis might be further modified.[4]

In sum, Thiokol could not be found to have breached any implied terms of an employment contract when it discharged Johnson because it followed the procedures set forth in the manual.

DURHAM, J., concurs in the concurring opinion of STEWART, J.

---

4. In passing, I note that, on the facts, this case is not altogether unlike *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991), in which we held that the covenant of good faith implied into every contract did not modify the terms of an at-will employment contract to require that an employer who discharges an employee have some "good faith basis for doing so."