2016 UT App 35

## THE UTAH COURT OF APPEALS

LUCINDA D. REYNOLDS,
Appellant,
*v.*
GENTRY FINANCE CORPORATION AND ROYAL MANAGEMENT,
Appellees.

Opinion
No. 20140574-CA
Filed February 19, 2016

Fifth District Court, St. George Department
The Honorable Eric A. Ludlow
No. 110501046

William F. Rummler and Christopher A. Lund,
Attorneys for Appellant

Steven R. Bangerter and Daniel P. Wilde, Attorneys
for Appellee Gentry Finance Corporation

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
concurred.

VOROS, Judge:

¶1 After being reassured repeatedly and prominently in writing that her employer would take no adverse action against any employee for bringing a complaint to the home office—and in fact that the employer viewed not reporting violations of company policy as misconduct—appellant Lucinda D. Reynolds reported that her immediate supervisor had directed her to act in violation of company policy and applicable law. She was fired two weeks later. The district court ruled on summary judgment that the discharge violated no law because Reynolds was an at-will employee. Reynolds appeals from that order. We affirm in

part and reverse in part and remand for further proceedings consistent with this opinion.

BACKGROUND[1]

¶2      Reynolds began working for Gentry Finance Corporation and Royal Management (collectively Gentry) in June 2009. She received two employee manuals intended to provide employees with an "understanding of our personnel policies" as part of her orientation.

¶3      The manuals required managers to report wrongdoing. The manuals stated in "numerous places" that "managers are told to report wrongdoing . . . and are repeatedly assured that '*NO EMPLOYEE WILL BE TERMINATED OR HAVE ANY ADVERSE ACTION TAKEN AGAINST THEM FOR BRINGING A COMPLAINT TO THE ATTENTION OF THE HOME OFFICE.*'" (Capitalization, boldface, and italics in original.) Such assurances appear throughout the manuals, often bolded, italicized, and set apart in text boxes; written in all capital letters; punctuated with exclamation points; and prominently displayed at the top of a page or on a separate page entirely. The manuals also state that not reporting wrongdoing constitutes "violating Company Policy." But page 5 of the Gentry manual also includes a disclaimer, buried in the body of the manual's text, stating that "[this handbook] is not an employment contract and is not intended to create contractual obligations of any kind. Neither the employee nor the company is bound to continue the employment relationship if either chooses, at its will, to end the relationship at any time."

---

1. In reviewing a district court's grant of summary judgment, we view "the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party" and recite the facts accordingly. *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citation and internal quotation marks omitted).

¶4      In February 2010, Gentry promoted Reynolds to manager of its St. George office. That same month she signed an employment agreement, containing an integration clause, stating that she was "deemed to be an employee at will." This agreement contained no mention of a duty to report wrongdoing.

¶5      From the time she was hired until December 17, 2010, Reynolds received at least 17 performance evaluations containing a mix of positive and negative appraisals of her job performance. In early January 2011, Reynolds's supervisor prepared a memo detailing a lack of year-over-year loan growth in Reynolds's office and describing her slow-file (delinquent loan) rate as "too high for the lack of growth the office has had." This memo also stated that Reynolds displayed "a negative attitude" when discussing these issues. Shortly thereafter her supervisor directed Reynolds to call former borrowers, including those whose accounts had been closed for more than 14 months. Reynolds refused, on the ground that the calls would violate Gentry's policy. According to Reynolds, her supervisor also instructed her to call former borrowers whose accounts had been closed for more than 18 months. Reynolds again refused, this time on the ground that the calls would violate state and federal law.

¶6      Reynolds reported this incident to an executive at Gentry on January 12, 2011. The executive confirmed to Reynolds's supervisor that company policy prohibited contact with former borrowers after 14 months, but also instructed Reynolds to be "more subtle in the way she relates disagreement with directives to her supervisor." One week later, Gentry suspended Reynolds pending an investigation of her account activity by her supervisor. Her supervisor's investigation reported "slow file is high," "no growth," "poor collection practices," and "overall attitude is poor" as reasons justifying termination. Gentry terminated Reynolds's employment on January 25, 2011, less than two weeks after she reported her supervisor.

ISSUES AND STANDARD OF REVIEW

¶7    Reynolds contends that the district court erred as a matter of law in granting summary judgment against her. First, she contends that her termination breached the employee manuals, which created an implied-in-fact contract that modified her at-will employment status. Second, she contends that her termination violates clear and substantial public policy. Finally, she contends that genuine issues of fact preclude summary judgment.

¶8    "The court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). "Since the trial court has no comparative advantage over the appellate court in resolving these questions, the appellate court reviews a summary judgment for correctness, giving no deference to the trial court's decision." *Bahr v. Imus*, 2011 UT 19, ¶ 15, 250 P.3d 56. We view "the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citation and internal quotation marks omitted). However, "the mere existence of genuine issues of fact . . . does not preclude the entry of summary judgment if those issues are immaterial to the resolution of the case." *Doyle v. Lehi City*, 2012 UT App 342, ¶ 19, 291 P.3d 853 (omission in original) (citation and internal quotation marks omitted).

ANALYSIS

I. Implied-in-Fact Contract

¶9    Reynolds contends that the employee manuals created an implied-in-fact contract that modified her at-will employment status.

¶10 An employee manual may create a unilateral contract. *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1001 (Utah 1991). "Under a unilateral contract analysis, an employer's promise of employment under certain terms and for an indefinite period constitutes both the terms of the employment contract and the employer's consideration for the employment contract." *Id.* at 1001–02. "The employee's performance of service pursuant to the employer's offer constitutes both the employee's acceptance of the offer and the employee's consideration for the contract." *Id.* at 1002. "The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employment supplies the necessary consideration for the offer." *Id.* (citation and internal quotation marks omitted).

¶11 "At-will employment is a bundle of different privileges, any or all of which an employer can surrender through an oral agreement." *Sanderson v. First Sec. Leasing Co.*, 844 P.2d 303, 307 (Utah 1992). The modification need not be oral. But the employer must communicate a manifestation of intent to the employee that is sufficiently definite that the "employee can reasonably believe that the employer is making an offer of employment other than employment at will." *Johnson*, 818 P.2d at 1002. "[I]t is not clear what type of evidence is sufficient to raise a triable issue concerning the intentions of the parties and therefore the existence of an implied-in-fact contract term." *Id.* But an employee handbook distributed to an at-will employee may modify the at-will employment relationship. *Id.* at 1003. "[E]mployee manuals and bulletins containing policies for employee termination are legitimate sources for determining the apparent intentions of the parties and for fixing the terms of the employment relationship." *Id.* at 1002. However, a manual that "contains clear and conspicuous language disclaiming any contractual liability and stating [the employer's] intent to maintain an at-will relationship with its employees" will not raise a triable issue. *Id.* at 1003.

¶12    This is so because "Utah law allows employers to disclaim any contractual relationship that might otherwise arise from employee manuals." *Tomlinson v. NCR Corp.*, 2014 UT 55, ¶ 25, 345 P.3d 523. Thus, "when an employee handbook contains a clear and conspicuous disclaimer of contractual liability, any other agreement terms must be construed in the light of the disclaimer." *Hodgson v. Bunzl Utah, Inc.*, 844 P.2d 331, 334 (Utah 1992). "The prominence of the text, the placement of the disclaimer, and the language of the disclaimer are all relevant factors in determining whether a disclaimer is clear and conspicuous." *Tomlinson*, 2014 UT 55, ¶ 26. For example, in *Tomlinson*, a disclaimer "conspicuously located at the top of the relevant policy" and "prominently bolded and set apart by a text box" was "sufficiently prominent to put employees on notice of its terms." *Id.* ¶ 28.

¶13    Here, both Reynolds's employment agreement and Gentry's employee manuals describe her employment as at-will. Altogether the portions of the employee manuals included in the record contain four references to at-will employment. One of these references also contains a disclaimer of contractual liability. The disclaimer reads, "[This] is not an employment contract and is not intended to create contractual obligations of any kind. Neither the employee nor the company is bound to continue the employment relationship if either chooses, at its will, to end the relationship at any time." The text of this disclaimer closely tracks the text of the disclaimer in *Johnson*, which our supreme court held was sufficiently clear to convey the intent of Johnson's employer to maintain an at-will relationship. *Johnson*, 818 P.2d at 1003.

¶14    However, the disclaimer here is far from being "clear and conspicuous." In *Tomlinson*, a disclaimer "conspicuously located at the top of the relevant policy and . . . prominently bolded and set apart by a text box" was deemed "sufficiently prominent to place a reasonable employee on notice." *Tomlinson*, 2014 UT 55, ¶ 28. Gentry's disclaimer, by contrast, is not placed at the top of

the relevant policy, not prominent, not bolded, and not set apart by a text box. It is, in a word, inconspicuous.

¶15    Far more conspicuous are the manuals' repeated assurances that no employee "will be terminated for submitting a complaint or grievance." These statements, which occur no fewer than ten times in the manuals provided to Reynolds, are frequently bolded, italicized, set apart in text boxes, written in all capital letters, and punctuated with exclamation points. Some of these assurances occupy an entire page or appear at the top or bottom of the page, distinctly apart from the rest of the text.

¶16    We conclude that the employment manuals create a triable issue as to whether Gentry intended to be contractually bound by its repeated statements that no employee would be terminated for submitting a complaint or grievance. Indeed, these statements overshadow the four references to at-will employment in the company manuals in frequency, prominence, and placement.[2]

¶17    But that conclusion does not end the inquiry. The district court ruled that under the parol evidence rule the integration clause in Reynolds's employment agreement rendered her "attempt to find a contract in the employee handbook . . . unavailing." Whether the disclaimer found in the employment manuals qualifies as an implied-in-fact unilateral contract will not matter if the parol evidence rule excludes the employee manuals from the analysis.

---

2. The evidence that Gentry intended to be bound by these statements is so persuasive that even counsel for Gentry acknowledged in oral argument that these statements qualified Reynolds's at-will employment status. However, he quickly added that it did not matter, because "[Reynolds] was not fired for that reason."

¶18   Our supreme court has explained that, under the parol evidence rule, "when parties have reduced to writing what appears to be a complete and certain agreement, it will be conclusively presumed, in the absence of fraud, that the writing contains the whole of the agreement between the parties." *Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 12, 182 P.3d 326 (citation and internal quotation marks omitted). However, the rule "has a very narrow application." *Union Bank v. Swenson*, 707 P.2d 663, 665 (Utah 1985). It will "exclude evidence of contemporaneous conversations, representations, or statements offered for the purpose of varying or adding to the terms of an integrated contract" in the absence of fraud or other invalidating causes. *Tangren*, 2008 UT 20, ¶ 11 (citation, emphasis, and internal quotation marks omitted). But it does not foreclose future amendments or modifications to an integrated agreement. "The parol evidence rule only purports to foreclose events which precede or accompany a written or oral integration, not those which come later . . . ." *Wilson v. Gardner*, 348 P.2d 931, 933 (Utah 1960). Thus, "[t]he parol evidence rule precludes extrinsic evidence of prior or contemporaneous agreements that contradict, vary, or add to an integrated writing—it does not relate to future agreements and does not bar extrinsic evidence that proves that the parties subsequently modified their integrated writing." *In re Insurance Installment Fee Cases*, 150 Cal. Rptr. 3d 618, 632 (Ct. App. 2012) (alteration in original) (citation, emphasis, and internal quotation marks omitted).

¶19   Reynolds's employment agreement unambiguously states that she may be fired "at any time and without cause, notice or excuse for any reason." And it contains an integration clause. Because the agreement is integrated and unambiguous, the court could not admit parol evidence to vary or contradict its terms. *See Tangren*, 2008 UT 20, ¶ 11. But we do not understand Reynolds to be relying on the employee manuals for that purpose—or at least not for that purpose alone. Our supreme court held in *Johnson* that "subsequent expressed or implied

agreements [may modify] the at-will employment relationship." *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1004 (Utah 1991).

¶20    We understand Reynolds to be offering the employee manuals at least in part for this purpose—to show that the parties subsequently modified the at-will nature of Reynolds's employment agreement. True, Reynolds received the manuals before signing the employment agreement. But thereafter Gentry continued to promulgate the manuals and Reynolds continued to work, each thereby re-entering the unilateral contract; accordingly, their "conduct . . . [met] the standards of a unilateral offer and acceptance." *Hodgson v. Bunzl Utah, Inc.*, 844 P.2d 331, 334 (Utah 1992) (citing *Johnson*, 818 P.2d at 1002).[3]

¶21    Our supreme court has held that an employee manual may modify a prior employee contract. In *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395 (Utah 1998), the court held that even where "an express or implied contract" governs an employment relationship, "if an employee has knowledge of a distributed handbook that changes a condition of the employee's employment, and the employee remains in the company's employ, the modified conditions become part of the employee's employment contract." *Id.* at 401 (quoting *Trembly v. Mrs. Fields Cookies*, 884 P.2d 1306, 1312 (Utah Ct. App. 1994)). Although in that case the rule supported the employer's attempt to bind the employee to the terms of the employee manual, the rule by its nature equally supports an employee's attempt to bind the employer to the terms of the employee manual.

---

3. The agreement also states, "No change or modification hereof shall be valid or shall be binding unless the same is in writing and signed by the party intended to be bound." However, "a written contract may be orally modified notwithstanding a clause in the contract stipulating that any modification must be in writing." *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 13 n.4, 40 P.3d 1119.

¶22   Accordingly, we reverse the district court's ruling that the employment agreement foreclosed Reynolds's reliance on the employee manuals. Under *Ryan*, the employee manuals may well have modified the conditions of Reynolds's employment. And, as explained above, the manuals' terms present a triable issue of fact as to whether their disclaimers were sufficiently clear and conspicuous to negate other terms of the manuals that purport to qualify Reynolds's at-will status.

¶23   However, "we stress the narrowness of the implied-in-fact contract term that [Reynolds's] allegations would support." *See Sanderson v. First Sec. Leasing Co.*, 844 P.2d 303, 307 (Utah 1992). Gentry promised merely that it would not fire Reynolds for the reasons stated in the employee manuals—reporting misconduct—but it retained its "at-will prerogative to fire [Reynolds] at any time for any *other* reason." *See id.*

## II.  Violation of Clear and Substantial Public Policy

¶24   Reynolds also contends on appeal that regardless of the at-will nature of her employment, her termination violated clear and substantial public policy. This is so, she argues, because she was fired in retaliation for refusing to violate state and federal do-not-call laws and for reporting to management that her supervisor ordered her to break company policy and applicable law.

¶25   Generally an employer may terminate an at-will employee for any reason other than those prohibited by law. *Ray v. Wal-Mart Stores, Inc.*, 2015 UT 83, ¶ 12, 359 P.3d 614. However, "[a]n at-will employee whose employment has been terminated in violation of a clear and substantial public policy may sue for wrongful termination." *Id.* This exception applies only when "'the public interest is so strong and the policy so clear and weighty that we should place the policy beyond the reach' of any at-will employment contract." *Id.* (quoting *Touchard v. La-Z-Boy Inc.*, 2006 UT 71, ¶ 13, 148 P.3d 945).

¶26   Our supreme court has identified four categories of public policy that may provide a basis for a wrongful termination claim; these include refusing to violate the law and reporting criminal activity to a public authority:

> (i) refusing to commit an illegal or wrongful act, such as refusing to violate the antitrust laws; (ii) performing a public obligation, such as accepting jury duty; (iii) exercising a legal right or privilege, such as filing a workers' compensation claim; or (iv) reporting to a public authority criminal activity of the employer.

*Id.* ¶ 13 (citation, emphasis, and internal quotation marks omitted).

¶27   The supreme court has clarified that the Utah Code and the Utah Constitution may be used as authoritative sources to identify whether an issue is reflected in the clear and substantial public policy of Utah. *Id.* ¶¶ 28–29. Furthermore, "[p]ersons who are terminated from their employment because they refuse to engage in illegal activities that implicated clear and substantial Utah public policy considerations should be protected regardless of whether the applicable law is that of Utah, the federal government, or another state." *Rackley v. Fairview Care Centers, Inc.*, 2001 UT 32, ¶ 44, 23 P.3d 1022 (citation and internal quotation marks omitted). But even "if a public policy is reflected in the Utah Constitution, the Utah Code, and our common law decisions, it is not clear and substantial unless it is of overarching importance to the public, as opposed to the parties only." *Ray*, 2015 UT 83, ¶ 39 (citation and internal quotation marks omitted).

¶28   Reynolds alleges that Gentry discharged her for refusing to violate the law, for reporting her immediate supervisor's demand that she violate the law to upper management, or both. The supreme court has held the public policy exception to apply

where an employee was discharged for making an internal report about a bank's noncompliance with state reporting requirements, *see id.* ¶ 56 (citing *Heslop v. Bank of Utah*, 839 P.2d 828 (Utah 1992)), and where an employee was discharged for refusing to falsify tax documents, *see id.* ¶ 55 (citing *Peterson v. Browning*, 832 P.2d 1280 (Utah 1992)).

¶29 "But having a legal right or privilege alone does not mean that a terminated employee will necessarily have a valid claim for wrongful termination." *Id.* ¶ 14. To determine whether the legal principle at issue reflects the type of clear and substantial Utah public policy that qualifies as an exception to the at-will rule, our courts consider three factors: "(1) whether the policy at issue is reflected in authoritative sources of state public policy, (2) whether the policy affects the public generally as opposed to the private interests of the employee and the employer, and (3) whether countervailing policies outweigh the policy at issue." *Id.* (citations omitted).

¶30 Here, Reynolds identifies the state and federal statutes and the federal regulations that she refused to violate, which prohibit certain telemarketing calls. But her briefing on appeal does not demonstrate that those provisions embody the clear and substantial public policy of the State of Utah. She asserts merely that these laws "were created to protect the public from telemarketing abuse." While undoubtedly true, this single assertion, without elaboration or analysis, does not establish that protecting the public from unwanted telemarketing calls is of "overarching importance to the public." *Ray v. Wal-Mart Stores, Inc.*, 2015 UT 83, ¶ 39, 359 P.3d 614. Accordingly Reynolds has not discharged her appellate burden to demonstrate district court error. *See Simmons Media Group, LLC v. Waykar, LLC*, 2014 UT App 145, ¶ 37, 335 P.3d 885 (describing the level of argument required to prevail on appeal).

¶31 In sum, Reynolds has not shown that discharging an employee for refusing to violate state and federal telemarketing statutes and regulations contravenes the clear and substantial

public policy of the State of Utah. Accordingly, we affirm the order of the district court dismissing her cause of action insofar as it rests on public policy grounds.

### III. Genuine Issues of Material Fact

¶32    Finally, Reynolds contends that genuine issues of material fact preclude summary judgment. "We review a district court's decision granting summary judgment for correctness, viewing 'the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.'" *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 15 (quoting *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600).

¶33    A court "shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). A genuine dispute need not be shown by direct evidence; "inferences drawn from circumstantial evidence . . . may create a genuine issue of material fact." *USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 65, 235 P.3d 749. "Even absent a 'complete conflict as to certain facts,' a dispute of 'the understanding, intention, and consequences of those facts' may defeat summary judgment." *Id.* ¶ 32 (quoting *Sandberg v. Klein*, 576 P.2d 1291, 1292 (Utah 1978)).

¶34    Reynolds argues that the parties disagree on whether Gentry instructed her "to call persons on the national do-not-call registry or those with accounts older than 18 months." Gentry does not deny that a factual conflict exists on this point; it argues rather that the issue "is not critical." It is not critical, Gentry reasons, because even if Gentry did instruct Reynolds to make impermissible calls, "there is no evidence or reasonable inference that this had any bearing on [Gentry's] reason for terminating [her]." Gentry claims to have terminated her solely "because she failed to grow the office as expected." Reynolds responds that the evidence supports a logical inference that Gentry's stated reason for terminating her was pretextual.

¶35    A triable issue of fact may arise where "pretext is one of the logical inferences arising from the facts" raised by the employee. *See Uintah Basin Med. Ctr. v. Hardy*, 2008 UT 15, ¶ 17, 179 P.3d 786. Under related federal law, even if "an employer's proffered legitimate reason for a termination is factually true—for example, [the employee] did commit a safety violation—the reason may nevertheless be deemed pretextual if circumstances suggest that it does not adequately explain the employer's actions—for example, if the employer was more lenient with similarly-situated employees who committed the same violation." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 547 (10th Cir. 2014).

¶36    Here, Reynolds points to evidence that Gentry's stated reason for terminating her is pretextual. For example, Reynolds's scores on eight performance audits had ranged between 70 and 85 (out of a total of 100). But after she refused to break the law and questioned company supervisors about the issue, her immediate supervisor suspended her and conducted another audit. Her score on that audit dropped to 30. Reynolds argues that her score fell dramatically in part because she was not working due to the suspension. Reynolds also cites evidence that her predecessor failed three audits before being terminated, whereas Reynolds failed only one. Reynolds also argues that the timing of her discharge—eight days after she refused to violate the law and reported the request to her supervisor's superior—"is not a coincidence." Gentry responds that this inference is "pure speculation, conclusory argument, and unsubstantiated opinion."

¶37    In addition, Reynolds testified that her direct supervisor directed her to act in violation of law, stating that "sometimes, in order to keep your job, you have to be willing to break the rules." Reynolds then contacted that supervisor's superior. That superior later testified that if he were given the choice between obeying company policy and obeying a direct supervisor, he would obey the direct supervisor. And Reynolds testified that the superior told her, "Well, when your supervisor tells you to

do something, you need to do it." When Reynolds took the issue to the supervisor's superior, he stated, "Well, we all know that our job is on the line every day."

¶38 We agree with Gentry that Reynolds "cannot create a dispute on a material issue of fact or disputed inference by simply saying there is a dispute, or, based upon speculation, a subjective belief or opinion." But Reynolds has done more than that here. Viewing the evidence in the light most favorable to her, as we must, we conclude that pretext is one of the logical inferences arising from the facts presented and thus that Reynolds has raised a genuine issue of material fact as to "whether the business reasons offered by [Gentry] for [Reynolds's] termination were pretextual." *See Uintah Basin*, 2008 UT 15, ¶ 20.

## CONCLUSION

¶39 Insofar as the summary judgment concludes that Reynolds has no colorable claim under the public policy exception to the at-will employment rule, it is affirmed. In all other respects, it is reversed. We accordingly remand the case for further proceedings consistent with this opinion.

————————