2001 UT App 35

Jay L. WOOD, Darrell K. Tanner, Scott A. Stokes, and Leo Syphus, individuals, Plaintiffs and Appellants,

v.

UTAH FARM BUREAU INSURANCE COMPANY, a Utah corporation; Farm Bureau Life Insurance Company, an Iowa corporation; and FLB Insurance Company, an Iowa corporation, Defendants and Appellees.

No. 20000349–CA.

Court of Appeals of Utah.

Feb. 8, 2001.

John E.S. Robson, Robert A. Garda Jr., and Todd C. Emerson, Fabian & Clendenin, Salt Lake City, for Appellants.

Stephen G. Morgan and Joseph E. Minnock, Morgan Meyer & Rice LC, Salt Lake City, for Appellees.

Before Judges JACKSON, BENCH, and DAVIS.

## OPINION

BENCH, Judge:

¶ 1 Plaintiffs appeal from a grant of summary judgment in favor of Defendants. On appeal, Plaintiffs contend material issues of fact exist, making summary judgment improper. We affirm in part, reverse in part, and remand.

## BACKGROUND

¶ 2 Plaintiffs Wood, Tanner, Stokes, and Syphus are all former insurance agents of Farm Bureau Insurance Company (Farm Bureau). They wrote and serviced Farm Bureau insurance policies for clients. In the course of their work, Plaintiffs kept records regarding the policies and policy holders they serviced. Plaintiffs received an initial commission on each new insurance policy they wrote and a renewal commission on each renewed policy they were assigned to service. During their time as Farm Bureau agents, Plaintiffs each signed a Career Agent Contract (Contract), which governed their working relationship with Farm Bureau. The Contract includes a clause declaring the agent to be an independent contractor and not an employee. Also included is a clause providing that either party may terminate the Contract at any time, with or without cause. Tanner signed a Contract on February 9, 1994. Wood and Syphus signed Contracts on February 22, 1994, and Stokes signed a Contract on March 7, 1994. All of these Contracts were effective January 1, 1994.

¶ 3 Before signing the Contract, Plaintiffs Wood, Tanner, and Stokes met with their local Farm Bureau manager to discuss productivity and set goals for 1994. On October 15, 1993, the manager sent Wood, Tanner, and Stokes letters memorializing their individual sales goals. The letters also required each agent to complete one-half of his total sales goals by the end of the second quarter of 1994. If the agent was off target at that time, the letter stated that the manager would begin recruiting a new agent. A follow-up review was to occur at the end of the third quarter. Following completion of this review, the letter stated that one of two things could happen: (1) if the sales numbers met expectations, the manager would simply add the newly recruited agent; or (2) if the sales numbers did not meet expectations, the agent would be replaced by the newly recruited agent. After sending the letters, the Farm Bureau manager held weekly meetings with Wood, Tanner, and Stokes. During these meetings, the manager reviewed each agent's progress in meeting his goals. These weekly meetings continued until the three agents were terminated. On March 23, 1994, Farm Bureau representatives individually approached Wood, Tanner, and Stokes and

read them a copy of a termination letter. Each letter states, "This letter is to inform you that we are cancelling your contracts as a career agent [and] this cancellation is to be effective March 25, 1994." Both Tanner and Stokes specifically asked why they were being terminated, and the Farm Bureau representatives' response was that they did not have to give a reason for termination.

¶ 4 Syphus worked in a different local office than the other Plaintiffs, but was similarly terminated. Following a meeting with Syphus, a local Farm Bureau manager sent Syphus a letter, dated June 30, 1994, which memorialized their agreed-upon goals. Unlike the lengthy review process for Wood, Tanner, and Stokes, Syphus's letter simply indicated that if he did not meet the goals, "retirement or career contract termination will be the alternative as of 9/30/94." On September 12, 1994,[1] Syphus received a termination letter from Farm Bureau effective September 30, 1994. His termination letter contained the same language as the other Plaintiffs' termination letters. After receiving notice of termination, each Plaintiff immediately vacated his office and returned all client records to Farm Bureau. Farm Bureau reassigned the terminated agents' client records, client service responsibilities, and future renewal commissions to other Farm Bureau agents.

¶ 5 Plaintiffs sued Farm Bureau asserting six claims for relief: (1) breach of contract—confiscation of books of business; (2) unjust enrichment; (3) breach of contract—wrongful termination; (4) breach of implied covenant of good faith and fair dealing; (5) interference with existing and prospective economic relations; and (6) punitive damages. The trial court granted summary judgment in favor of Farm Bureau on all six causes of action. This appeal followed.

## ISSUES AND STANDARD OF REVIEW

■ ¶ 6 Summary judgment is proper when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."

Utah R.Civ.P. 56(c). "In reviewing the trial court's decision to grant summary judgment, we give the court's legal decisions no deference, reviewing for correctness, while reviewing the facts and inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Dairy Prod. Serv., Inc. v. City of Wellsville*, 2000 UT 81, ¶ 15, 13 P.3d 581.

## ANALYSIS

I. Ownership of Business Records and Renewal Commissions

■ ¶ 7 In their complaint, Plaintiffs contended that Farm Bureau breached the Contract when it confiscated Plaintiffs' books of business. A review of Plaintiffs' answers to interrogatories reveals that Plaintiffs were actually seeking ownership of the business records and renewal commissions. Plaintiffs first argue that their business as independent contractors was separate from Farm Bureau's business, and that the records and renewal commissions belong to the agents as fruits of their personal business. It is undisputed that, by the terms of the Contract, Plaintiffs were independent contractors. The Contract provides:

> Career Agent has the right to control the activities and means by which the provisions of this agreement are carried out, the right to exercise independent judgment as to the persons from whom applications for insurance policies will be solicited, and the right to determine the time, place and manner of soliciting and servicing policyholders of [Farm Bureau].

This clause defines the independence that agents have in their day-to-day work, but does not suggest in any way that agents have ownership of the business records and renewal commissions. Even if a general right to ownership of the records and renewal commissions can be inferred from an agent's status as an independent contractor, such an inference does not overcome the more specific provisions of the Contract covering ownership of those items. *See Docutel Olivetti*

---

1. The parties disagree on the date Syphus received the letter. Farm Bureau claims Syphus received the letter on September 27, 1994, and Syphus claims he received it on September 12, 1994. We resolve this factual dispute in favor of Syphus as the nonmoving party.

*Corp. v. Dick Brady Sys., Inc.,* 731 P.2d 475, 480 (Utah 1986) (Howe, J., concurring in part, dissenting in part) (citing Restatement (Second) of Contracts § 203(c) for the rule that general terms of a contract are not given as much weight as specific terms); *accord Mayer v. Pierce County Med. Bureau,* 80 Wash.App. 416, 909 P.2d 1323, 1327 (1995).

¶ 8 The Contract specifically gives Farm Bureau ownership of the records and renewal commissions. The Contract provision regarding the business records states:

> All accounts, account records, policyholder files, policyholder lists, rate books or manuals, applications and other forms, and all other records in Career Agent's possession pertaining to [Farm Bureau's] business will be the property of [Farm Bureau] and will be returned to [Farm Bureau] upon demand.

Plaintiffs focus on the Contract language "pertaining to [Farm Bureau's] business" as support for their argument that the records they created pertained to their own personal businesses as independent contractors. However, Farm Bureau only took possession of those records that Plaintiffs created in relation to the clients' Farm Bureau insurance coverage. Such records clearly "pertain" to Farm Bureau's insurance business, and thus belong to Farm Bureau under the Contract. As for the renewal commissions, the Contract specifies that renewal commissions will be paid to an agent only until the agent's Contract is terminated. Once Plaintiffs' Contracts were terminated, they lost all claim to future renewal commissions.

¶ 9 Plaintiffs alternatively argue that the Contract language is ambiguous, so the parties' intent regarding ownership of the records and renewal commissions must be discerned from the parties' course of conduct. We conclude that the Contract language is not ambiguous and that the parties intended that Farm Bureau own the records and the renewal commissions. Because the Contract unambiguously gives Farm Bureau ownership of these items, the extrinsic course of conduct does not create a material question of fact. *See Saunders v. Sharp,* 806 P.2d 198, 200 (Utah 1991) ("The interpretation of a

contract is a matter of law for the court to determine unless the contract is ambiguous and evidence of the parties' intent ... is necessary to establish the terms of the contract."). Thus, we conclude that summary judgment was properly granted on this cause of action.

## II. Unjust Enrichment

¶ 10 As an alternative to breach of contract, Plaintiffs claim Farm Bureau was unjustly enriched when it took the business records and renewal commissions without giving fair value to Plaintiffs. However, recovery under an unjust enrichment theory is available only when "no *enforceable* written or oral contract exists." *Bailey–Allen Co. Inc. v. Kurzet,* 876 P.2d 421, 425 (Utah Ct. App.1994). In this case, the Contract provisions regarding ownership of the account records and renewal commissions are enforceable and give Farm Bureau ownership of those items. Therefore, the trial court properly disposed of Plaintiffs' claim of unjust enrichment on motion for summary judgment.

## III. Wrongful Termination
### A. Wood, Tanner, and Stokes

¶ 11 Early in 1994, Wood, Tanner, and Stokes each signed the Contract, which includes the following termination clause:

> This Contract may be terminated by [Farm Bureau] or Career Agent at any time, with or without cause, by giving notice of termination, in writing, to the other party. Notice of Termination need not include the reason or reasons, if any, for such termination.
>
> Career Agent acknowledges that [Farm Bureau has] not, either expressly or otherwise, agreed to continue the term of this Contract, for any definite period of time.

There is no dispute that this language created an at-will relationship.

¶ 12 An at-will relationship, however, may be modified by a subsequent "implied or express agreement that the employment may be terminated only for cause or upon satisfaction of any other agreed-upon condition." *Fox v. MCI Communications Corp.,* 931 P.2d

857, 859 (Utah 1997). Plaintiffs Wood, Tanner, and Stokes contend the terms of the October 15, 1993 letters created an implied-in-fact agreement, which promised a continued working relationship if they met specified production goals by the end of the third quarter of 1994. Although they concede the 1993 letters were superseded by the at-will provision contained in the later-signed Contracts, Wood, Tanner, and Stokes contend the promises contained in the letters were revived as implied-in-fact contract terms after they signed their Contracts. *See Ryan v. Dan's Food Stores, Inc.,* 972 P.2d 395, 401 (Utah 1998) (ruling implied-in-fact contract terms superseded by later received employee handbook).

¶ 13 The existence of an implied-in-fact agreement is normally a question of fact left to the jury, but "if the evidence presented is such that no reasonable jury could conclude that the parties agreed to limit the employer's right to terminate the employee, it is appropriate for a court to decide the issue as a matter of law." *Johnson v. Morton Thiokol, Inc.,* 818 P.2d 997, 1001 (Utah 1991) (footnote omitted). A review of the evidence leads us to conclude that the trial court was correct in granting summary judgment in favor of Farm Bureau in regard to the termination of Wood and Tanner, but erred in granting summary judgment on Stokes's termination.

¶ 14 Plaintiffs have "the burden of establishing the existence of an implied-in-fact contract provision." *Id.* Satisfaction of this burden requires Plaintiffs to show that Farm Bureau made a unilateral contract offer. *See id.* at 1002. Specifically, Plaintiffs must show:

> "a manifestation of the employer's intent that is communicated to the employee and sufficiently definite to operate as a contract provision. Furthermore, the manifestation of the employer's intent must be of such a nature that the employee can reasonably believe that the employer is making an offer of employment other than employment at will."

*Kirberg v. West One Bank,* 872 P.2d 39, 41 (Utah Ct.App.1994) (citation omitted). Oral statements and course of conduct may be used as evidence of Farm Bureau's intent to modify the at-will provision. *See Hodgson v. Bunzl Utah, Inc.,* 844 P.2d 331, 334 (Utah 1992). "In order for conduct and oral statements to establish an implied-in-fact contract, such evidence must be strong enough to overcome ... any inconsistent written policies and disclaimers." *Id.*

¶ 15 After the Contracts were signed, Wood, Tanner, and Stokes argue that Farm Bureau reaffirmed the earlier letters in weekly meetings. In support, they point to their affidavits. Based upon the weekly meetings, all three stated in their affidavits, "I believed that I could not be terminated even after signing the 1994 Career Agent Contract unless I failed to meet the stated minimums in the October 15, 1993 letter." In addition, Tanner states that in his weekly meetings, "I was given reports indicating whether I was meeting the goals set forth in the letter he gave me dated October 15, 1993." Wood states that he also attended weekly meetings and, "I was under the impression that the October 15 letter continued to govern our relationship."

¶ 16 Taken as true, these affidavit statements do not satisfy the requirements of a unilateral contract offer. Specifically, they fail to allege Farm Bureau communicated any affirmative manifestation of intent, whether oral, course of conduct, or otherwise, that would reasonably justify Wood's and Tanner's beliefs that they were anything other than at-will agents. Neither Wood nor Tanner allege the Farm Bureau manager orally indicated that they would not be terminated. Neither do they allege the Farm Bureau manager made any oral statements that the letters governed the relationship. Although Wood states he was under the impression that the letters governed, he fails to identify an affirmative manifestation communicated by Farm Bureau that can stand as a contract offer and support his impression.

¶ 17 Furthermore, in regards to course of conduct, neither Wood nor Tanner allege the Farm Bureau manager referred to the provision in the letters about retention and termination. Although Tanner was given reports indicating his progress in meeting the goals

contained in his letter, reference to the goals alone is not specific enough, especially when viewed in light of the clear at-will Contract provision, to revive the portion of the letter dealing with termination. *See Hodgson*, 844 P.2d at 334 (stating asserted implied-in-fact contract terms must be construed in light of any clear at-will provision). Setting and reviewing performance goals is a standard business practice, but the existence of goals does not ensure continued employment until the time set for completion of those goals if the employment relationship is at-will. Although Wood and Tanner may have subjectively believed that the terms of the letter governed their relationship, such belief was not reasonable without a more specific manifestation of Farm Bureau's "clear and unequivocal intention to relinquish the right to fire" Wood or Tanner. *Sanderson v. First Sec. Leasing Co.*, 844 P.2d 303, 307 (Utah 1992) (finding oral statement that "the job would be there" when employee recovered from his illness was a clear manifestation of intent not to terminate); *see also Hodgson*, 844 P.2d at 334 (finding employee's subjective belief that she would not be fired was not reasonable without a sufficiently definite offer of employment other than at-will).

¶ 18 Stokes, however, has established a question of fact as to whether an implied-in-fact contract existed. In his affidavit, Stokes states that the Farm Bureau manager "in our weekly review sessions after I signed the 1994 Career Agent Contract, affirmed to me that I would not be terminated unless I failed to meet the goals in the October 15, 1993 letter." Stokes's deposition, although somewhat equivocal on the issue, supports his affidavit when read in the light most favorable to him. In his deposition, Stokes claims a Farm Bureau manager told him, "It's going to take me nine months to twelve months to even get around to hiring anybody to replace you, so you've got plenty of time to get out there and write your business." Taking these statements as true,

a reasonable jury could conclude that an implied-in-fact contract existed between Farm Bureau and Stokes and that Farm Bureau breached that contract by terminating Stokes on March 23, 1994.[2] Therefore, the trial court improperly granted summary judgment on Stokes's wrongful termination claim.

### B. Syphus

¶ 19 Syphus signed a Contract on February 22, 1994. His Contract contained the same termination clause as the Contracts signed by Wood, Tanner, and Stokes. However, Syphus asserts that the June 30, 1994 letter created an implied-in-fact contract, which promised a continued working relationship if Syphus met his production goals by September 30, 1994. He further claims Farm Bureau breached that agreement by terminating him on September 12, 1994.[3]

¶ 20 Unlike the 1993 letters to Wood, Tanner, and Stokes, the June 30, 1994 letter to Syphus does not make any statement regarding retention if Syphus met his goals. In fact, the letter simply states, "Knowing these requirements and expectations to be necessary; if they are not met, retirement or career contract termination will be the alternative as of 9/30/94." Syphus incorrectly reads this conditional promise to terminate him as a conditional promise not to terminate him. The two are distinct and separate promises. Perhaps Syphus subjectively understood the language to mean that he would not be terminated prior to September 30, but the language of the letter does not contain the requisite manifestation of Farm Bureau's "clear and unequivocal intention to relinquish the right to fire" Syphus at any time, with or without cause. *Sanderson*, 844 P.2d at 307.

¶ 21 Other than the letter, Syphus points to a conversation with a Farm Bureau manager, which occurred sometime shortly after Wood, Tanner, and Stokes were terminated, as support for an implied-in-fact con-

---

2. Although Stokes's termination letter states the effective date of termination is March 25, 1994, the facts support a termination date of March 23, 1994 when viewed in the light most favorable to Stokes.

3. Although Syphus's termination letter states the effective date of termination is September 30, 1994, the facts support a termination date of September 12, 1994 when viewed in the light most favorable to Syphus.

tract. Syphus claims a Farm Bureau manager told him, "I want you to know what happened [to Wood, Tanner, and Stokes] doesn't apply to you." Without more, this statement is not definite enough to establish an implied-in-fact contract term. Rather, it was in the nature of " 'vague encouragement' and 'hyperbolic optimism,' which is insufficient to convey a clear and unequivocal intention to relinquish the right to terminate at will." *Robertson v. Utah Fuel Co.*, 889 P.2d 1382, 1387 (Utah Ct.App.1995) (holding statement, "Don't you worry about a thing. Get your problem taken care of . . . ." was an insufficient manifestation of intent to relinquish the right to terminate at-will). Even if the conversation were specific enough to operate as an implied-in-fact contract term, Syphus subsequently received the June 30, 1994 letter, which clearly indicates that termination was being considered. The letter would have superseded any promise of retention made in the earlier conversation. *See Ryan*, 972 P.2d at 401 (ruling implied-in-fact contract terms superseded by later received employee handbook).

¶ 22 Because there was no implied-in-fact contract to modify the Contract signed by Syphus on February 22, 1994, the working relationship remained at-will. Consequently, the date Syphus was terminated is irrelevant, as is the issue of whether Syphus could have met his goals by September 30, 1994. Thus, we conclude that the trial court properly granted summary judgment on Syphus's wrongful termination claim.

## IV. Good Faith and Fair Dealing

■ ¶ 23 Plaintiffs next claim Farm Bureau violated an implied covenant of good faith and fair dealing by taking the business records and renewal commissions after terminating Plaintiffs' Contracts. Parties to a contract must exercise their contractual rights in good faith. *See Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991). Good faith and fair dealing means the parties must be faithful to the " 'agreed common purpose' " and consistent with " 'the justified expectations of the other party.' " *Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.*, 889 P.2d 445, 451 (Utah

Ct.App.1994) (quoting Restatement (Second) of Contracts § 205 cmt. a (1979)). The covenant does not, however, "establish new, independent rights or duties not agreed upon by the parties," nor may the covenant "be used to nullify a right granted by a contract to one of the parties." *Brehany*, 812 P.2d at 55. In the discussion above we concluded that the records and renewal commissions belong to Farm Bureau under the unambiguous terms of the Contract. Farm Bureau did not breach the covenant of good faith and fair dealing by taking possession of the very records and renewal commissions that it rightfully owned under the Contract.

¶ 24 Plaintiffs also allege Farm Bureau breached the covenant of good faith and fair dealing by encouraging the agents to meet their goals with the promise of future employment, only to fire them when they started to produce. As discussed above, with the possible exception of Stokes, each of the Plaintiffs worked under an at-will arrangement. In that arrangement, either party could terminate the Contract "at any time, with or without cause." Farm Bureau exercised that right, and under an at-will analysis the timing of the terminations is irrelevant. Because a material question of fact remains as to whether an implied-in-fact contract existed between Farm Bureau and Stokes, a question of fact also remains as to whether Farm Bureau breached the covenant of good faith and fair dealing by terminating Stokes prior to his goal deadline. Thus, the trial court's grant of summary judgment in favor of Farm Bureau on the issue of good faith and fair dealing was improper only as it pertains to Stokes.

## V. Interference With Economic Relations and Punitive Damages

■ ¶ 25 Plaintiffs finally assert summary judgment was improperly granted in favor of Farm Bureau in relation to Plaintiffs' punitive damage claim. Punitive damages "cannot be awarded for a breach of contract unless the breach amounts to an independent tort." *Highland Constr. Co. v. Union Pacific R.R. Co.*, 683 P.2d 1042, 1049 (Utah 1984). The only tort Plaintiffs assert is intentional interference with economic re-

lations. Although Plaintiffs argued intentional interference and punitive damages in their briefs, they conceded at oral argument that they cannot establish a claim for punitive damages. Therefore, we conclude the trial court properly granted summary judgment on these causes of action as to all Plaintiffs and do not address those issues further.

## CONCLUSION

¶ 26 The trial court properly granted summary judgment on all causes of action by Wood, Tanner, and Syphus. Except for causes of action for wrongful termination and breach of good faith and fair dealing, summary judgment was properly granted on Stokes's causes of action.

¶ 27 Affirmed in part, reversed in part, and remanded for further proceedings.

¶ 28 WE CONCUR: NORMAN H. JACKSON, Associate Presiding Judge, and JAMES Z. DAVIS, Judge.