**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ROBERT J. BALDING,

    Plaintiff - Appellant,

v.

SUNBELT STEEL TEXAS, INC.;
SUNBELT STEEL TEXAS, LLC;
RELIANCE STEEL & ALUMINUM CO.,
DOES 1 through 50, inclusive,

    Defendants - Appellees.

No. 16-4095
(D.C. No. 2:14-CV-00090-CW)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BALDOCK**, **KELLY**, and **O'BRIEN**, Circuit Judges.
_____

    After he was fired from his job as a steel salesman, Robert Balding sued his

employer, Sunbelt Steel Texas, Inc., its predecessor, Sunbelt Steel Texas, LLC

(together, Sunbelt), and Sunbelt's parent company, Reliance Steel & Aluminum Co.

(Reliance). He asserted claims for breach of contract and quantum meruit/unjust

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

enrichment[1] under Utah state law, and for violations of the Family and Medical Leave Act (FMLA) and the Americans with Disabilities Act (ADA). The district court entered summary judgment in favor of defendants on all claims, and Balding appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse on the breach-of-contract claim as to both Sunbelt and Reliance and affirm in all other respects.

## BACKGROUND

In April 2009, Balding began working as a salesman for Sunbelt, a distributor of specialty steel bar headquartered in Texas. Balding was the lone Sunbelt employee based in Utah. The terms of his compensation were originally set out in an email from Sunbelt's Vice-President of Sales, Jerry Wasson: $30,000 a year in base salary plus 1.5% commissions on "total gross sales." Aplt. App., Vol. I at 56. Wasson told Balding his base salary was lower than that of a salesman who could not earn commissions and he could not "have it both ways" (i.e., higher salary and commissions). *Id.* Sunbelt never paid Balding any commissions, but it did raise his base salary to $40,000 in January 2010. Sunbelt's Executive Vice President, Kathy Rutledge, who directly supervised Balding at the time, claimed she told Balding the raise was in lieu of commissions, but Balding denied ever having been told that.

---

[1] We will refer to this claim as the "unjust enrichment" claim. *See Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000, 1012 (Utah 2015) (explaining that unjust enrichment, also known as "[c]ontracts implied in law" or "quasi-contract[]," is one of quantum meruit's "two distinct branches" (the other being "contracts implied in fact")). In this claim, Balding sought relief under the "unjust enrichment" branch of quantum meruit. *See* Aplt. App., Vol. I at 35.

2

Sunbelt later raised his base salary to $45,000 in April 2011, $52,000 in January 2012, and $60,000 in May 2012. Between December 2010 and October 2012, Sunbelt also paid Balding seven bonuses totaling $23,250.

During the course of his employment with Sunbelt, Balding suffered from, and Sunbelt was aware of, various medical issues, including a panic attack on November 20, 2013. The next day, Balding informed Sunbelt that his doctor recommended he take some time off work, and Sunbelt told him he could do so.

While Balding was out, his supervisor, Mike Kowalski, Jr., was monitoring his email. On November 26, one of Balding's customers, Weatherford, emailed Balding about the status of an order and also emailed him a copy of the associated purchase order, which was dated November 5, 2013. Kowalski and Sunbelt's Inside Sales Manager, Todd Perrin, investigated and determined that although the order had not been entered into Sunbelt's system, Balding had promised Weatherford by email on November 21 that the order was "in process," he was "rushing [it] through," the "dock date" would be "3 days," and the parts would be "to freight forwarder" by November 26, 2013. *Id.*, Vol. II at 355–56. According to Kowalski and Perrin, none of that could have been true without a purchase order in Sunbelt's system.

Kowalski and Perrin called Balding and asked why he had told Weatherford the order was in process. According to Kowalski, Balding denied having told Weatherford the order was in process until Kowalski revealed that he had reviewed Balding's email. But according to Balding, he told Kowalski he did not know why he had not entered the Weatherford order, and that although Kowalski accused him of

3

lying about his representations to Weatherford, he told Kowalski he had reserved steel bars for the order while waiting for the hardcopy of the purchase order.

Kowalski Jr. then informed Rutledge and Sunbelt's President, Mike Kowalski, Sr., what had happened. The three of them agreed to terminate Balding's employment because he had made misrepresentations about the order to Weatherford and then lied about it to them, and because Kowalski Jr. previously had received complaints from two of Balding's other customers, had issued a written warning in August 2013 to Balding based one of those complaints, and had issued another written warning less than two weeks prior to the Weatherford incident because Balding was consistently late with reports and his voicemail was constantly full. Rutledge called Balding that day (November 26) and told him he was fired.

In this action, Balding alleged Sunbelt owed him $173,277.92 in commissions based on the compensation agreement set out in Wasson's email or under a theory of unjust enrichment. In his claims under FMLA (interference and retaliation) and the ADA (discrimination, retaliation, and failure to accommodate), Balding alleged he was fired because of his health issues and for trying to take FMLA leave. He further claimed Reliance was jointly liable with Sunbelt for any alleged wrongful conduct.

In seeking summary judgment, Sunbelt maintained there was no breach of the promise to pay commissions because Balding agreed to new compensation terms when he continued to work while accepting the raises and bonuses without objection to not being paid any commissions. Sunbelt also argued the contract between Sunbelt and Balding foreclosed the unjust enrichment claim under Utah law. And Sunbelt

4

asserted there was no evidence Balding had a disability as defined in the ADA, it had provided all the accommodations Balding had requested, and it had fired Balding for a legitimate, non-discriminatory and non-retaliatory reason, which foreclosed relief under the ADA and FMLA. Reliance, which had acquired Sunbelt in October 2012, argued it was not liable on any claims because it was not Balding's employer and also for the same reasons set out in Sunbelt's motion for summary judgment.

After a hearing, the district court issued an oral ruling granting defendants' motions for summary judgment on all claims. Balding sought relief under Fed. R. Civ. P. 59, which the court granted in part as to the FMLA claims and the ADA retaliation claim against Sunbelt, concluding there was sufficient evidence of pretext to get to the jury. The court left unchanged the remainder of its oral rulings, although it fleshed out its reasoning on most of the other claims, including that Sunbelt was entitled to summary judgment on the ADA discrimination and accommodation claims because Balding had not established that he had a qualifying disability and because Sunbelt had provided every accommodation Balding had requested.

Sunbelt and Balding then both filed Rule 59 motions seeking reconsideration of the first post-judgment decision. The court granted Sunbelt's motion and denied Balding's. The court concluded that in its first post-judgment decision, it had misapprehended the controlling law on pretext, and under the correct analysis, Balding's evidence was insufficient to avoid summary judgment. The court therefore awarded summary judgment to Sunbelt on *all* the FMLA and ADA claims, including the ADA discrimination and accommodation claims. Balding appeals.

5

**DISCUSSION**

We review an order granting "summary judgment de novo, applying the same standards that the district court should have applied." *Fields v. City of Tulsa*, 753 F.3d 1000, 1008 (10th Cir. 2014) (internal quotation marks omitted). A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the nonmoving party." *Fields*, 753 F.3d at 1009 (internal quotation marks omitted).

**A.     ADA and FMLA claims**

The district court granted summary judgment to Sunbelt on the FMLA and ADA claims by applying the *McDonnell Douglas*[2] burden-shifting analysis and concluding that Balding had not shown a genuine dispute of material fact that Sunbelt's proffered reason for terminating his employment was pretextual. *See* Aplt. App., Vol. IV at 1156–65. It was proper to do so for the FMLA retaliation and ADA claims. *See DeWitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306–07 (10th Cir. 2017) (describing three-step burden-shifting analysis applicable to FMLA retaliation and ADA discrimination and accommodation claims); *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1186 (10th Cir. 2016) (same with respect to ADA retaliation claim). But because the burden-shifting analysis does not apply to a FMLA interference

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

6

claim, "no pretext analysis is necessary"; instead, "summary judgment for [an] employer is warranted when there is no genuine dispute as to any material fact regarding alternative reasons for termination." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 978 (10th Cir. 2017) (internal quotation marks omitted). The district court recognized this distinction in its first post-judgment decision, *see* Aplt. App., Vol. IV at 1028, but in its second post-judgment decision, the court engaged in only a pretext analysis for *all* the FMLA and ADA claims, including the FMLA interference claim.

That was incorrect. But regardless, the two standards are similar enough that we are confident in the court's final analysis. In examining pretext, the relevant inquiry, as the district court correctly noted, is not whether Sunbelt's "'proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs.'" Aplt. App., Vol. IV at 1160 (quoting *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013)). Similarly, in considering an employer's proffered rationale for an adverse employment action that allegedly interfered with an employee's FMLA leave, "[w]hat is important is . . . whether the [employer] terminated [the employee] because it sincerely, even if mistakenly, believed [in the proffered rationale]." *Dalpiaz v. Carbon Cty.*, 760 F.3d 1126, 1134 (10th Cir. 2014).[3]

---

[3] As to his FMLA claims, Balding argues, as he did before the district court, that where wrongful conduct is carried out by the employer's "corporate proxy," the employer is subject to strict liability under *Harris v. Forklift Systems, Inc.*, 510 U.S.

(continued)

In reaching the conclusion that summary judgment in favor of Sunbelt was warranted on all the FMLA and ADA claims, the district court examined four facts bearing on Sunbelt's claimed reason for firing Balding: (1) Sunbelt knew about a number of Balding's health issues before terminating him; (2) Sunbelt decided to fire Balding the same day it learned about the Weatherford issue and while Balding was on leave and without a meaningful investigation; (3) Sunbelt's senior management (including Kowalski Sr. and Rutledge) had agreed on November 22 that Sunbelt might have to fire Balding after January 1, 2014;[4] and (4) management was on notice that Weatherford might have backdated to November 5 the purchase order it sent on November 26.

---

17, 21 (1993). Aplt. Opening Br. at 57. Like the district court, we reject this argument. Although Balding is correct that the burden-shifting analysis does not apply to FMLA interference claims, that is not because of anything in *Harris*. *Harris* was not a FMLA case and makes no mention of strict liability for conduct by a "corporate proxy." Hence, *Harris* is wholly irrelevant to Balding's argument, and we are at a loss why his counsel has repeated this argument on appeal.

[4] This fact was set out in Exhibit O to Balding's declaration filed with his opposition to summary judgment. The district court considered this fact despite finding defendants' evidentiary objection to it "well taken." Aplt. App., Vol. IV at 1033 n.9. The court also considered "well taken" defendants' evidentiary objections to a large number of paragraphs of Balding's declaration and other exhibits attached to it. *Id.* In his opening appellate brief, Balding did not take issue with the court's ruling on the evidentiary objections, so defendants argued he therefore waived any challenge to that ruling. In his reply brief, Balding finally challenged the ruling. We need not sort out the evidentiary ruling because the district court considered Exhibit O, and none of our rulings in this decision are dependent solely on any of the other stricken provisions or exhibits. We express no view on the propriety of the district court's ruling on the evidentiary objections.

8

The district court concluded that despite these facts, there was no genuine dispute that Sunbelt honestly believed Balding had misled Weatherford about the status of the order and then lied about it when confronted. The court provided a thorough explanation that we need not repeat here; we have reviewed it, along with the record, the controlling law, and the parties' arguments, and we agree with the court's analysis. We therefore affirm summary judgment on the FMLA and ADA claims for substantially the same reasons stated in the district court's second post-judgment decision. In addition, to the extent the ADA accommodation claim concerns pre-termination conduct, we also affirm summary judgment in favor of Sunbelt because Balding failed to show he did not receive any pre-termination accommodation he requested. *See* Aplt. App., Vol. IV at 1043 (concluding, in first post-judgment decision, that Balding's failure to make this showing "independently defeats [his] ADA failure to accommodate claim"). We do not see how the failure to show pretext warrants summary judgment on any pre-termination accommodation claim Balding may have asserted.

## B.    Breach-of-contract claim

On the breach-of-contract claim, the district court ruled that Balding was precluded from claiming entitlement to the 1.5% commission on his total gross sales set out in his original compensation agreement because he accepted raises and bonuses for several years and did not object to Sunbelt's failure to pay him any commissions. The court determined "a jury could find only that from January 2010 through the end of his employment in November 2013, Balding accepted salary

9

increases, accepted bonuses, never complained to his direct supervisors about not receiving commissions, and never asked Sunbelt for an accounting or in any way made a demand for commission payments." *Id.* at 1026.

The court reached this conclusion by testing the facts against several principles of Utah law concerning modification of unilateral contracts with implied-in-fact terms. In doing so, however, the court seems to have overlooked an important component of such a modification—whether Balding could only have reasonably believed Sunbelt was extending a new offer based on the new terms.

In *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997 (Utah 1991), the Utah Supreme Court set out the general principle that in unilateral employment contracts, an employee's conduct can result in a new or changed contractual obligation:

> In the case of unilateral contract[s] for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. In this manner, an original employment contract may be modified or replaced by a subsequent unilateral contract. The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employment supplies the necessary consideration for the offer.

*Id.* at 1002 (internal quotation marks omitted).[5] The district court relied on this passage from *Johnson*. But *Johnson* went on to state that although it was unclear "what type of evidence is sufficient to raise a triable issue concerning the intentions

---

[5] The issue in *Johnson* was whether an implied-in-fact contract between an employer and employee included a provision that the employee, who otherwise was an at-will employee, could be fired only for good cause. Notwithstanding this factual distinction, *Johnson*'s analysis can be applied here.

10

of the parties and therefore the existence of an implied-in-fact contract term," it was

"clear that the evidence must be sufficient to fulfill the requirements of a unilateral

offer." *Id.* And to find an implied-in-fact provision in a unilateral contract

enforceable, *Johnson* requires the employer to communicate to the employee its

intent that it is offering a new term in a manner sufficiently definite for the employee

to reasonably believe the employer is offering that term:

> [F]or an implied-in-fact contract term to exist, it must meet the
> requirements for an offer of a unilateral contract. There must be a
> manifestation of the employer's intent that is communicated to the
> employee and sufficiently definite to operate as a contract provision.
> Furthermore, the manifestation of the employer's intent must be of such a
> nature that the employee can *reasonably believe* that the employer is
> making an offer of employment [on new terms].

*Id.* (emphasis added) (footnotes omitted).

The chief manifestation of Sunbelt's intent concerning base-salary raises is

disputed—whether Rutledge told Balding the initial $10,000 raise was in lieu of

commissions. The district court considered this factual dispute immaterial under

*Johnson* and other Utah law and instead focused on Balding's conduct in accepting

raises without complaining about the lack of commission payment.[6] The district

---

[6] In addition to the one quote from *Johnson*, the district court also relied on Restatement (Second) of Contracts § 202(4) (Am. Law Inst. 1981), which provides: "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." And the district court cited *B.R. Woodward Marketing, Inc. v. Collins Food Service, Inc.*, 754 P.2d 99, 103 (Utah Ct. App. 1988), for the principle that "one cannot prevent a waiver by a private mental reservation contrary to an intent to waive, where his or her actions clearly indicate such an intent." As we proceed to explain, there is a genuine dispute of

(continued)

11

court concluded it would be unreasonable for Balding to believe he was still on a commission structure when his first raise ($10,000) far exceeded the commissions he alleged he was owed at that point ($3,725),[7] and Wasson's initial email offer of employment told Balding he could not have both commissions and a base salary as high as a non-commissioned salesman.

The court also relied on the fact that after the initial raise in January 2010, the only conversation Balding had with a supervisor occurred in April 2012, when Balding sent an email to Kowalski Sr. after having had an oral discussion with him about commissions. Balding wrote:

> I could tell that you were surprised to hear of a commission which was written up for me. I would like you to know that I am grateful for profit sharing and other incentives Sunbelt Steel gives. I am here to help grow [the company] and become [a] huge part of Sunbelt Steel. If there could be some consideration that [sic] would be grateful.

Aplt. App., Vol. II at 536. Kowalski Sr. replied: "Thanks, Rob. I plan to have follow-up conversations with Kathy [Rutledge] & Jerry [Wasson] this week and will get back to you. Hang in there!" *Id.* Kowalski Sr. never got back to Balding. In his

---

material fact whether Balding had "knowledge" of the claimed nature of the raises and bonuses such that he had to have reasonably believed commissions were no longer part of his compensation package. And tied to that disputed material fact is whether Balding "clearly indicate[d]," *id.*, (or could have indicated) an intent to waive the base-salary+commission structure.

[7] As time went on, Balding's sales grew to the point where the total in commission he alleges he is owed far exceeds what he earned in raises and bonuses. The district court did not take that into consideration, but it bears on the reasonableness of Balding's belief that the raises and bonuses were not in lieu of commissions.

12

affidavit, Kowalski Sr. explained that he "let the matter drop" and "no one at Sunbelt was earning commissions at [that] time." *Id.* at 373. The court declined to accept Balding's speculation that Kowalski Sr.'s failure to get back to him was evidence of deceit and guilt. The court also pointed out that when asked, Balding said he did not know why he did not raise the commission issue with either Rutledge or his other direct supervisor, Kowalski Jr., other than he thought Wasson was the one to go to.[8]

The district court's focus on Balding's conduct overlooked whether the offer of a raise in lieu of commissions was adequately communicated to Balding (setting aside what Rutledge allegedly told Balding) such that the only reasonable inference to be drawn from the facts is that Balding must have reasonably believed that Sunbelt had made that offer. And the only other record evidence of a manifestation of Sunbelt's intent regarding the raises is a "Personnel Change Notice" Sunbelt entered on January 6, 2012, reflecting a "*merit increase* effective 1/2/2012" for Balding. *Id.*, Vol. III at 622 (emphasis added). The notice states that his "Old Title/Salary" was "$45,000," and his "Job and Salary Change" was to "$52,000 yearly." *Id.* (some

---

[8] The district court also noted Balding twice asked Wasson when he might get paid commissions he was owed. Wasson first told Balding the "keystone group" of investors would not authorize a commission payment, Aplt. App., Vol. I at 258, and later said Sunbelt was just getting profitable and Balding should start seeing his commissions "shortly," *id.* at 259–60. But as the court observed, Balding testified he had contacted Wasson about commissions *before* the first raise in January 2010, so those contacts do not support Balding's argument that he believed he was entitled to commissions despite the parties' course of conduct *after* the January 2010 raise. Balding testified he spoke with Wasson about commissions again some time later, but he could not recall when or the content of the discussion.

13

capitalization omitted).  By referring only to base salary and not commissions, the notice could be viewed as a manifestation of Sunbelt's intent to supplant commissions with raises.  But the space for Balding's signature is empty; hence, it is unclear whether Balding saw the notice prior to his termination (neither he nor Sunbelt asserts that he did).  Even if he did, a factfinder could view the notice as evidence that Sunbelt simply gave Balding a merit-based raise to his base salary.  Because the notice is subject to interpretation by a factfinder, it is, along with whether Rutledge told Balding the initial raise was in lieu of commission, material to the definiteness of an offer to substitute raises for commissions.[9]

As for the bonuses, the only evidence bearing on Sunbelt's intent comes in the form of a memo Kowalski Sr. sent to all employees in September 2011 explaining the bonus plan Sunbelt had put in place for 2011:  "[A]ll employees are eligible to receive quarterly and annual bonuses that are based on the company's performance once a brief employment period has been satisfied.  The bonus amounts are discretionary and are primarily based on the achievement of certain goals such as sales volume and profitability."  *Id.*, Vol. II at 377.  By the time of this memo, Balding had already received three bonuses (in December 2010, April 2011, and July 2011).  But the memo says the bonuses are tied to company performance, not

---

[9] In addition to the Personnel Change Notice, the record contains two emails from Kowalski Sr. to Sunbelt's controller informing the controller of increases in Balding's base pay (from $30,000 to $40,000 in January 2010, and from $40,000 to $45,000 in April 2011).  *See* Aplt. App., Vol. III at 616, 618.  Like the notice, neither of the emails mentions commissions, but unlike the notice, there is no indication Balding may have seen them during his employment.

14

individual performance, as were Balding's commissions.  The memo, therefore, sheds little light on whether Balding had to have reasonably believed the bonuses were in lieu of the 1.5% commission on his total gross sales he was originally promised.

In sum, there are genuinely disputed issues of material fact on the contract claim.  We therefore reverse the grant of summary judgment to Sunbelt on that claim.

## C.  Unjust enrichment

We affirm the grant of summary judgment to Sunbelt and Reliance on the unjust enrichment claim.  Although the parties dispute the terms of Balding's compensation, the existence of a valid, enforceable compensation contract between Sunbelt and Balding is undisputed.  As the district court ruled, under Utah law, the existence of a valid, enforceable contract forecloses relief under a theory of unjust enrichment because the two theories of recovery are inconsistent.  *See Helf v. Chevron U.S.A., Inc.*, 361 P.3d 63, 78 (Utah 2015) ("Because a breach of contract remedy requires a valid, enforceable contract, while a quantum meruit remedy presupposes that no contract governs the services provided, a plaintiff may recover only one of these two inconsistent remedies."); *Concrete Prods. Co. v. Salt Lake Cty.*, 734 P.2d 910, 911 (Utah 1987) ("Unjust enrichment is a doctrine under which the law will imply a promise to pay for goods or services when there is neither an actual nor an implied contract between the parties.").  Balding contests only an "additional reason" the district court gave for granting summary judgment on the unjust enrichment claim—that even if there was no contract, unjust enrichment is

15

unavailable because his compensation was reasonable. Aplt. App., Vol. IV at 1027.

We need not decide the correctness of the court's "additional reason."

## D.     FMLA, ADA, and contract claims against Reliance

Balding brought the same FMLA, ADA, and breach-of-contract claims against

both Sunbelt and Reliance, contending that Reliance and Sunbelt were a joint

enterprise and that Reliance was as much his employer as Sunbelt. We affirm the

grant of summary judgment to Reliance on the FMLA and ADA claims. But we

reverse with respect to the contract claim because the district court never decided

whether Reliance was also Balding's employer or a party to Balding's compensation

agreement, and we decline to do so in the first instance.

At the oral hearing on defendants' motions for summary judgment, the district

court granted summary judgment to Reliance because the evidence was insufficient

"for a jury to conclude that the elements for the FMLA interference and other claims

that [the court] discussed would be sufficient to hold Reliance liable all for the same

reasons that [the court] explained as to Sunbelt." *Id.* at 944.[10] This ruling

encompassed all of Balding's claims because the court had already "discussed" them

all. In its first post-judgment decision, the court summarily denied Balding's Rule 59

motion "as to Reliance on all claims," *id.* at 1019, because Balding had "simply

reargue[d] the same facts that the court previously considered and found to be

---

[10] The court also considered whether the claims against Reliance were moot because of the rulings in favor of Sunbelt on all claims. *See* Aplt. App., Vol. IV at 939. But the court did not base the grant of summary judgment to Reliance on mootness.

16

inadequate to sustain his burden of going forward, particularly as to his 'joint' employer/enterprise theory claims against defendant Reliance, Sunbelt's parent 'umbrella' corporation," *id.* at 1022. In its second post-judgment decision, "the court decline[d] to revisit its prior ruling dismissing Balding's joint employer/enterprise theory claims against Reliance" and also ruled that Balding's claims against Reliance were moot because the court had dismissed "Balding's FMLA and ADA claims against Sunbelt on the grounds that their reasons for terminating him were not a pretext." *Id.* at 1149 n.3.

We agree with the district court's ruling that Reliance cannot be liable on the FMLA and ADA claims if Sunbelt is not. The same facts concerning the legitimacy of the proffered reason for terminating Balding's employment are the same as to both Sunbelt and Reliance; the only role Balding claimed Reliance played in the decision to fire him was approving Sunbelt's decision. But the sole reason the district court gave for granting summary judgment to Reliance on the contract claim was its grant of summary judgment to Sunbelt on that claim. Because we are reversing on the contract claim as to Sunbelt, the basis for the district court's ruling as to Reliance is wholly undermined. Despite claiming in its first post-judgment decision that it had already considered and found Balding's joint employer/enterprise theory inadequate, the court had not done so in its oral ruling; it simply granted summary judgment to

17

Reliance for the same reasons it had granted summary judgment to Sunbelt.[11]  We

therefore must reverse on the contract claim as to Reliance.  We decline to resolve in

the first instance Balding's joint employer/enterprise theory.

## CONCLUSION

The district court's grant of summary judgment to all defendants on the breach

of contract claim is reversed.  The grant of summary judgment to all defendants is

otherwise affirmed.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge

---

[11] Balding pointed this out in his second Rule 59 motion, arguing the court failed to provide "any analysis let alone a sound conclusion for ruling that . . . Reliance is somehow not also Balding's employer and a contracting party with Balding given the agreements and contractual duties by Reliance to Balding."  Aplt. App., Vol. IV at 1049 n.1.

16-4095, *Balding v. Sunbelt Steel Tex., Inc.*
**O'BRIEN**, J., concurring

The majority reverses the summary judgment entered in favor of defendants on Balding's breach of contract claim. While a reversal is necessary, I would limit the scope of reconsideration. In all other respects, I join the Order and Judgment.

At-will employment permits either of the parties to modify or end the relationship at any time for any reason—motive or purpose matter not. Of course, any change is prospective only (both parties are bound by their agreement until it is changed or terminated) and the employer's right to unilaterally terminate employment is limited by state and federal laws forbidding myriad discriminatory practices. Those exceptions aside, an employee may demand a raise (or other changes) and may walk away without consequence if the demand is not met. Conversely, an employer may, for whatever not improperly discriminatory reason, decide an employee is overpaid and require him to work for less pay or under different, but not legally prohibited, circumstances. The employee must then decide whether to accept the new terms or forego continued employment; it is a binary choice—unpleasant perhaps, but a choice nonetheless. There is no requirement that demanded or imposed changes be agreeable to the other party, or negotiable, or fair or even reasonable. If they are not accepted (or modified), employment ends. However, to be effective the changes must be clearly communicated to the affected party, either expressly or tacitly, and the affected party's response must be clearly communicated, either expressly or tacitly. "Clearly communicated" is an objective test. With those principles in mind, I turn to the matter at hand.

Balding signed on with Sunbelt in April 2009 as an at-will employee at a salary of $30,000 per year plus a 1.5% commission on sales. Wasson (the hiring authority for Sunbelt) explained that a commission was included because Balding's salary was lower than salesmen who did not receive commissions; Balding was pointedly told he could not have it both ways (higher salary and commissions).

No commissions were ever paid and no explicit change to the employment agreement was ever formally negotiated or even formally proposed. However, Balding's compensation changed significantly. Starting in January 2010 he received substantial raises and some bonus payments, summarized as follows:

| | |
|---|---|
| Employment start | April 2009 - $30,000 + 1.5% commission |
| Raise 1 | January 2010 – to $40,000 |
| Bonus 1 | December 2010 |
| Bonus 2 | April 2011 |
| Raise 2 | April 2011 – to $45,000 |
| Bonus 3 | July 2011 |
| Bonus 4 | October 2011 |
| Raise 3 | January 2012 – to $52,000 |
| Bonus 5 | January. 2012 |
| Bonus 6 | April 2012 |
| Ambiguous email | April 2012 – for email text see majority opinion at 12 |
| Raise 4 | May 2012 – to $60.000 |
| Bonus 7 | October 2012 (the 7 bonuses total $23,200) |
| Employment end | November 26, 2013 |

According to Sunbelt, contemporaneously with his first raise, Ms. Rutledge, Balding's supervisor, told him the raise was in lieu of commissions. Her testimony is the only proof. Balding says he was told no such thing by Rutledge or anyone else. Moreover, he claims to have repeatedly complained to Sunbelt's management team about its failure to pay his commissions. Indeed, two of those complaints appear in the record,

2

but they occurred before his first raise.  Beyond that, no admissible evidence clearly supports his claim of repeated complaints.  There is, however, an email he sent to Kowalski, Sr. in April 2012. It is, at best, equivocal and the parties offer conflicting interpretations.

The district judge dutifully acknowledged the dissonance in the Rutledge and the Balding positions and resolved the matter in Balding's favor.  But that did not end the debate.  The judge went on to properly conclude that Balding's employment was at-will and to announce the substance of his reasoning on the breach of contract claim, writing:

> On the evidence presented by Balding, a jury could find only that from January 2010 through the end of his employment in November 2013, Balding accepted salary increases, accepted bonuses, never complained to his direct supervisors about not receiving commissions, and never asked Sunbelt for an accounting or in any way made a demand for commission payments. The one conversation with Kowalski, Sr. in April 2012 in which Balding said he would be grateful if some consideration could be given to a commission, even drawing all inferences in favor of Balding, is not sufficient for a jury to find, in the face of Balding accepting raises and bonuses for four-and-one-half years without complaint, that the original agreement for compensation including a commission had not been superseded by the parties' course of dealing.

Aplt. App., Vol. IV at 1026.

Significantly, Balding knew from the start of his employment with Sunbelt that "he could not have it both ways" (a higher salary and commissions).  Somewhere along the time continuum detailed above, but no later than May 2012, when Balding accepted a raise to $60,000 without comment or complaint about commissions, no person could reasonably fail to recognize that the employment terms had changed – no commissions were paid, but raises and bonuses magically appeared and were accepted.  Balding might

3

not have liked or agreed with the new reality, but he was undeniably aware of it. Knowing the probable result of demanding payment for commissions—termination of his employment—he chose not to rock the boat. At that point his silence and decision to soldier on, coupled with an understanding of his binary option (accept the new compensation scheme or quit), was an assent to the changes (implied acceptance). No jury could reasonably conclude otherwise. In summary, there is a tipping point where minute factual distinctions cease to matter. Where it falls, exactly, on the timeline is a matter of fact, but the figurative "edge of the universe" is a matter of law and common sense, not fact.

The district judge looked at roughly four years of experience and concluded things had changed, but then he made his conclusion retroactive to the earliest possible date, January 2010. I don't see how that can be said without factual findings. Balding may have smelled something in the wind, but at that early date he cannot be charged with knowledge sufficient for summary judgment against him. For that reason I concur in the reversal and remand on the breach of contract issue. However, I would limit the remand to establishing a date prior to the May 2012 raise when Balding was sufficiently aware of the new employment terms to trigger his obligation to fish or cut bait. Damages for breach of contract, if any, should be accordingly limited. Balding is entitled to commissions at least through January 2010. The parties' dispute the amount; it will require resolution.

Balding argues that the defendants interfered with his ADA and FMLA rights and retaliated against him for attempting to exercise them. The district court entered

4

summary judgment against Balding on those claims and we have affirmed.  That said, on remand, any argument about the propriety of Balding's termination should have no place; he was an at-will employee—the only issues are, 1) the date of Balding's implied acceptance of the newly imposed compensation regime and 2) damages, if any.